## THE MASCOTTE.[1]

### CARTER *et al. v.* THE MASCOTTE, (two cases.)

*(District Court, S. D. New York.* October 31, 1891.)

1. CARRIERS—DAMAGE TO CARGO—UNEXPLAINED DAMAGE.
   Under the ordinary bill of lading, the burden being on the carrier to show that damage to cargo arises from an excepted peril, the carrier is liable when he has received cargo in good condition, and delivered it damaged, and is unable to explain how the damage occurred.

2. SAME—PLACE OF DELIVERY—TEA CARGOES—CUSTOM.
   Tea cargoes consigned to the "port of New York" are, by custom, discharged on the New York side of the East river. It has also been customary, when there is difficulty in procuring a berth in New York, for the ship to give notice thereof to the consignees of the tea, that they may have opportunity of finding the ship a berth in New York. The ship Mascotte, with tea and other cargo, arrived in the port of New York and was entered at the custom-house at 10 o'clock Monday, and could have begun to discharge 48 hours after. At half past 1 on Wednesday, no berth having been found for her in New York by her agents, she was sent to Brooklyn; two consignees of other parts of the cargo of same tea assenting thereto. Shortly afterwards her agents were notified of a berth in New York. No notice of her inability to find a berth in New York was given to the principal consignees of the tea. *Held,* that the ship should bear the extra expense to the consignees of tea caused by transporting the cargo from Brooklyn to New York. The Port Adelaide, 38 Fed. Rep. 753.

In Admiralty. Suit to recover for damage to cargo and extra expense caused by ship's docking in Brooklyn.

*Owen, Gray & Sturges*, for libelants.
*Convers & Kirlin*, for claimants.

BROWN, J. 1. As respects the claim for damage to tea caused by oil, the bill of lading, as well as the master's testimony, shows that the chests were received on board in good condition. Some of the chests on delivery were, beyond doubt, oil-stained and defaced. All that the claimants can do to exonerate the ship has doubtless been done; but, after all, the evidence shows nothing more than that they cannot explain how the stains and defacing occurred. It negatives certain causes that might, under some circumstances, have produced the damage; but this is not, I think, sufficient to release the ship from her legal obligation. The ship has possession and control of the goods from the time they are delivered into her custody. If the goods are received in good condition, as this bill of lading shows they were, she warrants their delivery in like

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

condition, unless damaged through the act of God, public enemies, the dangers of the seas, or through some other excepted cause. *The Montana, Liverpool & G. W. Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 437, 9 Sup. Ct. Rep. 469. The burden of showing that the damage arose from such an excepted cause is upon the ship. *Nelson* v. *Woodruff*, 1 Black, 156. As the Mascotte's evidence does not show this, but merely leaves the damage unexplained, I must therefore hold the ship liable for this item.

2. As respects the extra ferriage caused by the delivery of the tea in Brooklyn, instead of within the tea district in New York, I think the libelants are also entitled to recover. The evidence in the present case, like that in the case of *The Port Adelaide*, 38 Fed. Rep. 753, leaves no doubt of the long-established custom that cargoes of tea shipped by the bill of lading for "the port of New York" are to be delivered within the tea district on the New York side of the East river, and not in Brooklyn. The Mascotte, in the present case, had sulphur and rice for part of her cargo, and the owners of those parts of the cargo and of a little tea consented to the discharge of the steamer in Brooklyn. I do not perceive, however, how that circumstance can impair the right of the other consignees of tea forming an important part, if not the major part, of the whole cargo, to have a delivery of their goods made in accordance with the meaning of the bill of lading given for them, as that meaning is fixed by the long-prevailing usage, or how the obligation of the ship is changed in respect thereto. It is only within a short period that mixed cargoes containing tea have been brought from China; and not more than half a dozen vessels are mentioned as having gone to Brooklyn with such cargoes, when, after several days, it had been found impossible to obtain a berth on the New York side. Even in these few cases, the most that was claimed on behalf of the vessel was that she should be allowed to go to Brooklyn after the lapse of three or four days from the time of her entry at the custom-house. Until the lapse of 48 hours thereafter, delivery could not be commenced. In the present case the vessel was entered at 10 o'clock on Monday. At half past 1 on the Wednesday following a berth was engaged in Brooklyn, her agents in the mean time not having found a berth in New York. Within an hour or two afterwards, if not on the day before, (about which there is some dispute in the evidence,) they were notified of a berth ready for the ship in New York, which was declined. The evidence shows that since the case of *The Port Adelaide* the number of docks for the discharge of tea on the New York side within the tea district has been somewhat diminished by the appropriation of certain docks for railroad uses. In the change that circumstances enforce, it may be that, notwithstanding a prior custom, a vessel is not bound to wait unreasonably in order to discharge within the customary limit, where these limits themselves have been abridged. When difficulty has been experienced heretofore in finding a berth within the tea district, the evidence shows that the practice has been to give notice thereof to the consignees of tea, that they may have an opportunity to assist in finding such a berth before the ship goes to

Brooklyn. Had this practice been followed in this instance, the evidence leaves no doubt that the vessel would have been berthed in New York before she reached her berth in Brooklyn. Such a practice is a reasonable mode of enabling consignees to save themselves from the extra expense of a discharge elsewhere, and outside of the customary limits; and where such a berth in fact might, upon inquiry of the consignees, have been found within a reasonable time, had notice been given to the consignees of the inability of the ship to find a berth, and of the proposal to go to Brooklyn, it is the ship, and not the consignees of tea, who ought to pay the extra expense of going there, whatever may be the convenience to the ship, or to the consignees of other goods that the ship may have chosen to take on board. Decrees for the libelants in both cases, with costs.