### THE MAJESTIC.

### POTTER et al. v. THE MAJESTIC.

#### (District Court, S. D. New York. May 10, 1893.)

1. SHIPPING — PASSENGERS — DAMAGE TO BAGGAGE — FLOATING WRECKAGE — BROKEN PORT—LIABILITY OF CARRIER.

   Where a passenger's baggage was damaged, while in transit on a steamship, by sea water taken in through a broken porthole, and it was claimed in behalf of the vessel that the port was broken while passing through floating wreckage, and that this was a peril of the sea, *held*, that if the port was sound, but was unable to withstand a blow from floating wreckage while passing through it at full speed, then reasonable precaution required the ship to steam away from the wreckage, or slow down on passing through it, and it was for the ship, not the passenger, to take the risk of such damage.

2. SAME — STIPULATIONS EXEMPTING FROM LIABILITY — NOTICE ON PASSAGE TICKET—PASSENGER CONTRACT.

   A notice printed on the back of a passenger's ticket, exempting the carrier from liability under certain circumstances, never seen or read by the passenger, whose attention is *not called to it by any reference in the body of the contract* is outside of the contract, and not operative on the passenger.

In Admiralty. Libel for damage to passenger's baggage. Decree for libelants.

Cary & Whitridge, (Willard Parker Butler, of counsel,) for libelants.

Wheeler, Cortis & Godkin, (Everett P. Wheeler, of counsel,) for claimants.

BROWN, District Judge. The libelants were passengers on the steamship Majestic, which sailed from Liverpool on the 20th of January, 1892, and arrived at New York on the 28th. On disembarking, the contents of their trunks were found badly damaged by sea water. The above libel was filed to recover for the loss.

The trunks had been stowed for convenience of passengers in compartment No. 3 of the orlop deck, the same deck with passengers' rooms. On the fifth day out, the first officer, on examining the water-tight compartment at about 8 A. M., found two or three feet of water in that compartment, and one of the ports open, the glass having been shattered, and the iron cover, called a "dummy," which is designed to be screwed tight across it, forced open. During

the hour previous, from 7 to 8 A. M., according to the statement of the log, the ship had passed through some wreckage, which the captain testifies he observed, and states that it appeared to be the deck planking of some wreck of a vessel. The first officer speaks of a timber seen at some distance from the ship. The sea was rough. For the defense it is claimed that the water was taken in through the broken port in the rolling of the vessel in the heavy sea; that the break was caused by the floating wreckage; and that this was a peril of the sea, for which the ship is not liable.

The finding of two or three feet of water in the orlop compartment where the baggage was stowed, was so extraordinary an occurrence that the burden of proof is upon the ship to satisfy the court, with a reasonable degree of certainty, that this occurred without her fault. The evidence in this case does not seem to me sufficiently satisfactory on that point.

In the first place, there is no certainty as to the time when the port was opened, or what opened it. No examination of the compartment had been made for several days preceding the accident. The first officer, whose duty it was to make the inspection, stated at first that he had not examined the compartment at all since the vessel sailed. He afterwards stated that he had examined it on the following day. He does not state how much of an examination this was, or that it was any more careful than his inspection on the day the voyage began; and as regards that, he testifies, in answer to the question, "What inspection did you make?" Answer. "I merely opened the water-tight door and looked in." No satisfactory evidence is produced that all the ports had been examined or were properly closed before the vessel sailed; nor is there any indication of such an inspection of the compartment after she sailed as would show that had the port been open when the vessel sailed, it would have been observed by the first officer before the 25th, on merely looking in.

The port, as I understand, was considerably above the water line; and if open, it would only take in water through the rolling of the ship in a rough sea. No testimony was given tending to show how rapidly water would be taken in through such an open port in rough weather. I have no data for assuming that two or three feet of water on the deck was not as much as would have been taken in during the several days which had elapsed since the first officer had last looked in the compartment, or since the vessel sailed. That would depend in part on the weather. Had an inspection been made daily, that would have shown at least that no water had been taken in up to the day before, whether any open porthole had been noticed or not. It is not stated whether the covers or dummies to all the ports were screwed down tight, or whether some of the covers were left open for light, or for any other purpose.

Not only is the time uncertain when the port became open, or when the water first began to flow in, but there are no circumstances directly connecting this with the wreckage. No part of

any planking, or other object that might possibly have broken the port open, was found in the port, or, as far as appears, came through it into the ship. While, therefore, it is possible that the opening of the port may have been caused by the wreckage in the rough sea, this is after all but surmise; while testimony is absent which might have been sufficient to exclude other causes equally possible, whereby the port might have been open when the ship sailed.

But assuming that the accident was caused by wreckage, and that the wreckage referred to was of a kind adequate to force open an iron cover or dummy properly constructed and firmly screwed down over the port, I think that the ship should be held responsible for the risk taken in going at full speed and without any slackening for an hour, as appears by the log, through wreckage capable of doing such damage. There were no circumstances about the wreckage claimed to have been unknown to the officers of the ship. It was at the ship's option, either to steer away from the wreckage, or to slacken speed while passing through it. If this port was really in a sound and proper condition, and nevertheless not of sufficient strength to withstand such wreckage in a rough sea, then reasonable precaution required the ship to slacken speed while passing through it. It was for the ship, and not the passenger, to take this risk.

It is further claimed, however, that the responsibility of the ship is limited by the conditions printed upon the passenger's ticket, which exclude liability for perils of the sea, or for any negligence in the navigation of the steamer, and all liability for passengers' luggage beyond £10, unless the excess in value is declared, and freight thereon paid at the current rates. No such declaration or payment was made in this case.

Examination of the large-sized letter sheet called the passengers' ticket, shows that the sheet contains much that forms no part of the contract between the parties. It contains, first, considerable by way of display; next, near the middle of the sheet, five numbered paragraphs, consisting wholly of directions addressed to the agents or employes of the carrying company. Next comes what I regard as the contract between the parties, beginning with the words:

"British steamship 'Majestic' of 4244 tons register, to sail from Liverpool for New York on the 20th day of January, 1892. In consideration of the sum of £124. s10. I hereby agree with the person named in the margin hereof [the libelants] that such person shall be provided with first-class cabin passage in the above-named British steamship, * * * with not less than 20 cubical feet for luggage for each person * * *; and I further engage to land the person aforesaid with their luggage at the last-mentioned port free of any charge beyond the passage money aforesaid. * * *

[Signed in writing] "Per R. Martckellel.
"Liverpool, 16th January, 1892."

Next follow on the same page, two notices to cabin passengers, and several "cautions." On the back of the ticket, indorsed in print, are the conditions invoked by the claimants under the head

of "Notice to Passengers." At the foot of the previous page are the words "See back." The notice also states that "all questions arising on this ticket shall be decided according to English law." In the contract for passage, of which I have quoted all that is material, there is no reference to these conditions, nor any of all the "notices" contained on the ticket sheet.

By the English law as determined in the leading case of Navigation Co. v. Shand, 3 Moore. P. C. (N. S.) 272, 288, it was held that where the ticket, in the body of it, declared that it was subject to the conditions and regulations indorsed, and on its face and at the foot of it the passenger signed his acceptance thereof, conditions like those above named were valid, and would be binding upon the passenger. In the later case of Henderson v. Stevenson, (1875,) L. R. 2 H. L. Sc. 470, it was held in the house of lords in a case precisely parallel to the present, that such notices as the above indorsed upon the back of the ticket, but not referred to in the body of the contract, and not called to the passenger's attention, nor assented to by him, form no part of the contract, and are no defense in case of loss. By the English law, therefore, the conditions referred to form no part of this contract. They were never read or seen by the libelants, nor was their attention called to them. The tickets were purchased in London, and the ticket was not examined till collected by the steward on board the ship. The notices being outside of the contract and not referred to in it, are not operative upon the libelants.

The law of this country is to the same effect, and is concisely stated by Mr. Wheeler in his valuable work on the Modern Law of Carriers, (page 263,) in the following words:

"A notice or memorandum, even though printed upon the bill of lading or other contract with the carrier, unless referred to in the body of the contract and thus made a part of it, is no more than a notice, and does not form a part of the contract between the shipper and the carrier."

And this is supported by numerous authorities there referred to. Railroad Co. v. Manufacturing Co., 16 Wall. 318; Ayres v. Railroad Corp., 14 Blatchf. 9; and see Railroad Co. v. Fraloff, 100 U. S. 24.

The above authorities in effect also exclude the ship from the benefit of the ordinary exception of sea perils, which is usually inserted in bills of lading, and which possibly, in the absence of any contract for the transportation of passengers, might be an exception implied by law, through long usage, as respects the transportation of passengers' luggage. But in the present case, the contract as above quoted is an absolute and unconditional contract to "land the person aforesaid with their luggage at the last-mentioned port," that is, at the port of New York, without any exceptions embodied or referred to. Such a written contract supersedes any implied contract, and all implied exceptions, save the act of God and public enemies. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. Rep. 469; The Zenobia, Abb. Adm. 80.

Decree for the libelants, with costs.