## THE QUEEN.

### BANCROFT-WHITNEY CO. et al. v. THE QUEEN.

(District Court, N. D. California. November 25, 1896.)

#### No. 10,301.

1. LACHES IN ADMIRALTY—STATUTES OF LIMITATION.
    Mere delay, for the full period of four years allowed by a state statute of limitations, in bringing a suit in rem to recover damages to cargo, is not of itself, and in the absence of exceptional circumstances from which laches would be imputable, sufficient to justify the court in declining to entertain the suit.

2. SAME—STATE STATUTES CREATING LIENS.
    In a suit which is brought to enforce the lien given by the general maritime law for damage to cargo through the ship's fault, the limitation of one year contained in the California statute (Code Civ. Proc. § 813), which gives a lien for injuries to goods shipped on board a vessel, does not apply.

3. CARRIERS BY SEA—DAMAGE TO GOODS—PRESUMPTIONS.
    Where goods are returned to the port of shipment greatly damaged by sea water, a presumption arises of negligence on the part of the carrier.

4. SAME—PERILS OF THE SEA—EXCEPTIONS IN BILL OF LADING—BURDEN OF PROOF.
    A shipowner, against whom a prima facie case of negligence has been made out, does not discharge the burden of bringing himself within the exceptions of perils of the sea by simply showing that the ship was in a seaworthy condition at the commencement of the voyage, and presenting evidence which merely leaves in doubt the question as to how the leak arose which caused the damage.

5. INSURANCE—SUBROGATION—DISSOLVED PARTNERSHIP.
    An insurance company which has paid a loss upon partnership goods is not prevented, by the subsequent death of one of the partners and the resulting dissolution of the firm, from maintaining a suit in admiralty in the partnership name to recover the amount of the loss from the carrier.

6. CARRIERS—DAMAGE TO GOODS—ASCERTAINMENT OF DAMAGE—AUCTION SALES.
    Sale by auction in a great mart of commerce is a proper method of determining the value of goods damaged in the hands of a carrier.

7. ADMIRALTY—JURISDICTION IN REM.
    The requirement that a libel in rem must state that the property is in the district does not prevent the court from acquiring jurisdiction in the case of a vessel which, being within the district at the time the libel is verified, departs before it is filed, but, returning after the filing, is then seized on alias monition. 61 Fed. 213, reaffirmed.

This was a libel in rem, by various shippers of goods shipped on board the steamer Queen, for breach of contract, for damages to said goods by sea water, alleged to have been caused by the negligence of the master, officers, and crew of the steamer, while said goods were being transported from the port of San Francisco to the port of San Diego, state of California. The case involved 37 claims.

Various exceptions filed by the claimant to the libel were overruled in an opinion filed April 17, 1894. 61 Fed. 213. On May 12, 1896, the cause was heard on a motion by the claimant for a judgment in its favor after the libelants had rested their case, which motion was denied. 75 Fed. 74.

Andros & Frank, for libelants.
Geo. W. Towle, Jr., for claimant.

MORROW, District Judge. The action is for a breach of contract on the part of the carrier, and includes some 37 claims, made by various shippers of goods shipped on board the steamer Queen, for damages by sea water, alleged to have been caused by the negligence of the master, officers, and crew of the steamer, while said goods were being transported from the port of San Francisco to the port of San Diego, state of California. Testimony was introduced with respect to but two of the shipments, viz. that of the Bancroft-Whitney Company and that of Hellman, Haas & Co. It was intimated at the hearing that these two claims would present all the questions arising on the several claims, and that, after a final decision has been reached with respect to them, the others would be a matter of subsequent arrangement.

The question of laches, which was raised when the exceptions to the libel were argued, was again urged at the final hearing. While the court, at the argument of the exceptions, strongly intimated that it would deny this ground of exception, still the question was left open, subject to the introduction of evidence as to whether or not the libelants had been guilty of laches in failing to bring their suit within four years from the date of the contracts of affreightment. That portion of the opinion, rendered in ruling on the exceptions to the libel, so far as it is material to the present inquiry, is as follows:

"In other words, the deduction from the authorities is that, while there is no such thing as a statute of limitation in the admiralty law, yet courts of admiralty, in the furtherance of justice, will act by analogy, and refuse to entertain any suit where the party seeking to enforce his claim or lien has been guilty of laches. It is, in fact, the equitable doctrine of laches, depending upon the circumstances of the case. What would be laches in one case might not constitute such in another. The question is one addressed to the sound discretion of the court, depending upon all the facts of the particular case. It is, therefore, a question of evidence, to be determined hereafter upon the facts as they may appear." The Queen of the Pacific, 61 Fed. 213, 216.

Counsel for claimant refers to several provisions of the Code of Civil Procedure of the state of California, which provide different periods of limitation within which suit can be brought. Among these statutes of limitation which would be applicable, assuming that the court were justified in acting by analogy, and setting up the equitable bar of laches, is section 337 of the Code of Civil Procedure, which provides a limitation of four years in which "an action upon any contract, obligation, or liability, founded upon an instrument in writing executed in this state," can be brought.

As the contracts of affreightment which are involved in the present libel were all executed in this state, it follows that, if the court should determine that the libelants have been guilty of laches, the section referred to contains a rule applicable to this case. The libel was filed on the last day of the four-years limitation as to most of the contracts, although as to some of them it is one or two days behind the time. The claimant contends that this delay in bringing the libel constitutes laches. There is nothing in the case, however, outside of mere delay in bringing suit, which indicates that the libelants have been unduly negligent or unnecessarily slow in prosecuting their claims for damages. The most that can be said against them is that they have availed themselves of the full statutory period allowed by the state provision before instituting their suit. But this, of itself, without some proof of any exceptional circumstances from which laches would be imputable, is not sufficient to justify a court of admiralty in declining to entertain a suit, and refusing to pass upon its merits. As was said by Judge Lacombe, in Southard v. Brady, 36 Fed. 560:

"It is true that there is no statute of limitation in admiralty, but courts of admiralty, like those of equity, will not lend their aid to enforce stale demands. Exceptional circumstances sometimes induce a court of admiralty to pronounce a claim stale after a lapse of time less than the local statutory period of limitation. Where there is nothing exceptional in the case, the court will govern itself by the analogies of the common-law limitations."

Judge Brown, in Nesbit v. The Amboy, 36 Fed. 925, after stating that the courts of admiralty will enforce the doctrine of laches as against procrastinating litigants, where it appears that third parties have acquired a bona fide lien or right in a vessel, continues thus:

"But where no subsequent bona fide liens have arisen, there is no good reason why a suitor should not be permitted to proceed in rem in courts of admiralty, so long as he may sue in personam, or maintain a suit at law for the same debt,"— citing The Lillie Mills, 1 Spr. 307, Fed. Cas. No. 8,352; The Bristol, 11 Fed. 162; The Martino Cilento, 22 Fed. 859.

The circuit court of appeals for the Second circuit, in the case of Bailey v. Sundberg, 1 C. C. A. 387, 49 Fed. 583, speaking through Judge Wallace, said, in passing upon a contention, as in the case at bar, that the libelants had been guilty of laches in delaying the commencement of the suit:

"Inasmuch as the present action was commenced within six years from the time when the cause of action accrued, and there are no special circumstances to charge the cargo owner with laches, we think there is no equitable bar to the suit upon the ground of delay. Where there is nothing exceptional in the case, courts of admiralty govern themselves by the analogies of common-law limitations."

Further citation of authority is unnecessary. It only remains to apply the rule therein enunciated to the case at bar.

In the first place, it does not appear that the claimant, by this delay of four years, has been prejudiced in any of his rights, or that any defense which he could or would have presented has been impaired or jeopardized. It does not appear that the claimant could

or would have presented a stronger, or better defense, had the action been commenced sooner. No pretense is made that, by reason of the delay, witnesses have died or gone away, or that testimony, once accessible and material to a defense of negligence, has been lost. In other words, there is no showing by claimant of any special or exceptional circumstances which would justify this court, as a court proceeding upon equitable principles, to hold that the libelants have been guilty of such laches as, in good conscience and equity, amounts to an equitable defense and bar to this libel. While it is true that the long delay of four years is unexplained, and the court is at a loss to understand why the libel was not sooner filed, still such laches as there may have been is, under the facts of this case, not sufficient to justify this court in dismissing the case without considering its merits. The contention of counsel for claimant in this respect is, therefore, overruled.

With respect to the limitation of one year, contained in section 813 of the Code of Civil Procedure, as to suits to enforce the lien given by the state statute for injuries to goods shipped on board a vessel, what was said by this court in the opinion upon the exceptions to the libel (see opinion, 61 Fed. 213, 216, and cases there cited) is applicable and pertinent at the present time. It is sufficient to say, as was there stated, that the libelants are not suing to enforce the lien which the state statute purports to give, but they are suing to enforce the lien given by the general maritime law. See, particularly, The Key City, 14 Wall. 653, 660; Henry, Adm. Jur. & Proc. 185.

The libel sets forth that the goods comprising these several shipments were shipped in good order and condition, under the contracts contained in the shipping receipts; that the steamer sailed from the port of San Francisco with said goods on board, bound for the port of San Diego; that said goods were never delivered at the port of San Diego, but were returned to the port of San Francisco in a greatly damaged condition, having been wet with sea water during the voyage, which, it is alleged, gained access to the interior of the vessel, where the goods were stowed, by reason of the negligence of the steamship company and its officers and servants. The answer admits these facts, with the exception, however, that it denies specifically that said goods were so wet with sea water during said voyage through or by the negligence of the steamship company or its officers or servants. As a further and separate defense, the answer avers, substantially, that the said steamship, when she sailed from the port of San Francisco, was stout, staunch, strong, and seaworthy in every respect; that she was completely manned, officered, and otherwise thoroughly equipped for her then intended voyage; that she left San Francisco on April 29, 1888, at about 2 o'clock p. m., and proceeded down the bay, out through the Golden Gate, across the bar, and on her course in a southerly direction with a fresh northwest wind blowing and a northwest chop sea; that no unusual incident was known to occur during said 29th day of April; that about 1 o'clock a. m. of the next day, April 30th,

said steamship was noticed to have a slight list to starboard; that efforts were then made to correct such list by shifting freight to port in the between-decks, and burning coal mostly from the starboard bunkers; that about 2:15 or 2:30 o'clock a. m. of the same morning, water was discovered to be dropping from a point in the iron bulkhead on the starboard side of the engine room, and about 6 or 8 inches above the deck of the alleyway in the between-decks of the vessel; that the examination thereupon made resulted in the discovery of water in the between-decks of the steamship aft, such water extending about half way from the side of the ship to the hatch combings, but the aperture through which such water entered the vessel could not, after diligent search for the same, be discovered; that seamen were put to work passing such water down the hatches into the hold, so as to bring it within reach of the bilge pumps, and such pumps were kept in operation, notwithstanding which the water steadily increased between-decks, and the list of the vessel became so great that, about 5 o'clock a. m., it was deemed prudent by the master of the vessel to make for Port Harford with all convenient speed, which was done, and at about the hour of 7 o'clock a. m. the said vessel was run upon the beach at said Port Harford, at which place sea water immediately came in over her deck, and nearly filled the vessel with water, and thereby said merchandise became wet with sea water; that the beaching of said steamship was necessary to prevent and avoid a total loss of said steamship, and of all the merchandise then on board of her, and was done by the master thereof as the result of cool deliberation. and in the exercise of a wise discretion on his part as to what was best to be done, and with the purpose of saving said vessel and cargo, and of rendering entirely safe the lives of all the passengers and crew, aggregating 212 persons, then on board the vessel.

Under this state of the pleadings, the following facts appear to have been established: (1) That the libelants' merchandise was shipped under the contracts of affreightment, or "shipping receipts," as they are termed, annexed to the libel. (2) That such contracts or receipts provided, among other things, as follows: "The company shall not be held responsible for any damage or loss resulting from fire at sea or in port, accidents to or from machinery, boilers, or steam, or any other accident or danger of the seas, rivers, roadsteads, harbors, or of sail or steam navigation, of what nature or kind soever." (3) That the merchandise was never delivered at the port of destination. (4) That it was returned to San Francisco, and delivered to the shippers in a damaged condition. (5) That this damage arose from having been wet with sea water. Under the issues, as thus presented, the proctor for libelants contented himself with introducing the shipping receipts as evidence of the apparent good order and condition of the goods when delivered to the carrier for shipment. Some testimony, also, was introduced respecting the damaged state of the shipment of Hellman, Haas & Co. when it was returned to San Francisco, and that the goods, in their damaged state, realized less than they would have brought had they

been returned in good order and condition. The libelants then rested their case. Thereupon, claimant moved for a judgment in his favor, contending, among other things, that there was a presumption that the vessel was seaworthy when she set out on her voyage, and that the fact that the merchandise was damaged by sea water did not, in the absence of any affirmative proof by libelants of negligence on the part of the carrier, create a presumption of negligence against the latter, but rather gave rise to the presumption that such damage had been caused by a peril of the sea.

After elaborate arguments, this court held that, under the state of facts disclosed by the pleadings, and the proof introduced by the libelants, a prima facie case of negligence had been made out, and that the burden of removing this presumption, by showing affirmatively that the damage had arisen through a peril of the sea, or in some manner other than through the negligence of the carrier, devolved upon the claimant. The court pointed out that the admitted facts in the case were not sufficient to entitle the carrier to the presumption that his vessel was seaworthy at the inception of the voyage, but, on the contrary, they seemed to justify the presumption that the vessel was unseaworthy at that time; and the mere fact that the libelants' merchandise was wet and damaged by sea water which gained access to the vessel did not necessarily give rise to the presumption that it was occasioned by a peril of the sea. The motion for a judgment in favor of the claimant was, therefore, denied. The Queen of the Pacific, 75 Fed. 74.

The claimant thereupon introduced evidence in support of the averments of the answer, tending to show (1) that the steamship, when she sailed from the port of San Francisco, was absolutely seaworthy; (2) that she was manned by a competent master, officers, and crew; (3) that the fact that the vessel was leaking was discovered about 11 hours after the steamer sailed from San Francisco; (4) that everything was done, consistent with prudent navigation and good seamanship, to discover the aperture or place through which the water entered the vessel; (5) that the leak or quantity of water entering the vessel increased to such an extent that the vessel was compelled to put into Port Harford with all convenient speed, and was there beached about 17 hours after sailing from San Francisco. It appears, from the evidence, that the leak was on the starboard side of the vessel. The presence of water was first noticed at about 10 minutes past 2 o'clock of the morning of the 30th of April by a water tender, whose duty it was to look after the boilers, the ship's pumps, and the bilges, and whose watch it then was. He discovered a small amount of water on the floor of the engine room, in a place that should have been dry. Upon investigation, it was found that water was coming through a small hole in the bulkhead over the engine room, or, to be more specific, that it was dropping from a point in the iron bulkhead on the starboard side of the engine room, and about three or four inches above the deck of the alleyway in the between-decks of the vessel. The water was undoubtedly coming from what was termed a "water-tight com-

partment" on the starboard side. The matter was reported to the captain, and measures immediately taken to ascertain the locality and cause of the leak, and to arrest its progress. Two donkey pumps and a centrifugal pump were set to work. A list to starboard had been noticed about an hour previously, but no particular significance was attached to this at the time, although steps were taken to correct it by shifting freight from starboard to port, and burning coal mostly from the starboard bunkers. But, soon after the leak was discovered, the chief officer reported that there was a starboard list of from six to seven degrees. The hatch was taken off, to let the water descend into the ship's after lower hold, and the engineer tapped the lower hold in the alleyway and also the shaft alley. All measures, however, to arrest the flow of water into the compartment, and to correct the list of the vessel, proved in effectual and unavailing, for the list kept steadily increasing, until the captain, as set forth in the answer and reaffirmed in his testimony, acting under cool deliberation, and in the exercise of a wise discretion on his part as to what was best to be done, and with the purpose of saving the vessel and cargo, and lives of all persons, passengers and crew, on board, ran the vessel upon the beach af Port Harford in about 22½ feet of water, at about 7 o'clock a. m., or about seven hours after the leak was first discovered.

The evidence is silent as to the cause of the leak, and even the exact locality where the water gained access to the vessel is not disclosed by the evidence. Capt. Alexander, the master, testified that the vessel was an iron-screw steamer, brig-rigged, built by Cramp & Sons, of Philadelphia, in 1882; that she was submitted to regular inspections once a year from the time she was built until the date of the accident, on April 30, 1888; that she was rated by the board of inspectors, at the last examination, as "A1," and from the knowledge which the witness had of iron steam vessels, he would rate her, as she was at the time she sailed from Sar Francisco, just previous to the accident, as first-class,—the best that is given for iron steamships. Referring to the time when the leak was first discovered, the witness was asked:

"Q. Did you then endeavor to ascertain how the water entered the vessel? A. Yes, sir. Q. Were you able to find where it entered the vessel? A. No, sir. I knew very near where it came in the vessel, but I did not know how it came in, I knew it came in on the starboard side in a water-tight compartment."

On cross-examination, the witness was asked:

"Q. Could you tell about how high above the between-decks the leak was? A. I could not tell. It was in a water-tight compartment. So I had no way of seeing or finding out. * * * Q. This water-tight compartment, was it lengthwise of the ship or athwart ship? A. No, sir; fore and aft, opposite the boiler and engine. * * * Q. What is the width of the bulkhead alleyway inside? A. I don't know exactly, but I should say ten feet; it may be more than that; it may be eleven; it might be nine, or twelve; I should say about ten feet,—the width of the alleyway across between-decks. Q. Was the reason why you could not discover where this leak was on account of the between-decks being filled with cargo? A. No, sir. Q. Why could you not find it, if the cargo did not obscure it? A. We tried to discover it from the outside, and could not. There were men on the outside

to see if they could discover anything upon the outside of the ship, and could not. Q. Why did you not try to discover it from the inside if the cargo did not prevent you? A. My instructions have been and were— Q. Never mind your instructions. Why did you not do it? A. Because the United States inspectors told me to close those doors, and keep them closed, and never open them,—the United States inspectors of hulls and boilers. The Court: At sea? A. At sea, in case of an accident. Q. No matter what danger the ship was in? A. No matter what danger the ship was in. Q. Did you understand, by that instruction, that you were not to take any proper precaution to ascertain whether there was a leak or not, and stop it? A. How did I know there might not have been a plate off the side of the ship, or we had collided with something? To use good judgment, I considered it proper to keep those doors closed in all compartments, when we find the ship making water, and I should do the same thing to-morrow."

On redirect examination, the witness was asked:

"Q. Did you ascertain where the water came from into the after between-deck,— whether it came into the side of the vessel directly from that point, or whether it came in out there from the alleyway, as you term it? A. It came from the alleyway. Q. As I understand you, you did not consider it prudent, at that time, to open either of the doors that closed the alleyway? A. I did not, sir. * * * Q. There are two doors to each alleyway? A. Yes, sir; on the forward end and the after end. Q. The same on both sides? A. Yes, sir; on the port and starboard side."

The captain further testified that there was a guard, also known as a "stringer," or "fender," on the vessel. It was a piece of oak, 14 inches thick, upon the ship's side, put on between the deck frames, probably 10 inches down, and about 14 inches out from the ship's side. It extended to within 20 or 30 feet of the bow, and the same aft. The sea would wash over the guard four or five times a minute. When the vessel was on an even keel, in still water, the guard was a foot and a half above water, as the vessel was then loaded. This guard served for a fender, and was used, also, for landings. Nothing was afterwards discovered which indicated that this guard had anything to do with the leak, and the captain was not aware that, at any time during the voyage, the ship collided with or struck anything, until she was beached at Port Harford. Had anything serious of that character occurred, it would have been the duty of the officer of the deck, if he knew of it, to report it. No such report was, however, made. In closing the testimony of this witness, he testified as follows, in answer to questions propounded by counsel for libelants:

"Q. When you raised the steamer at Port Harford, in order to do that, did you pump her out? A. Yes, sir. Q. Was it necessary, in order to pump her out and float her, to ascertain where the leak was? I don't ask you what it was. A. I understand. Not necessarily so. Q. Did you understand where it was? Mr. Towle: Personally, yourself. Mr. Andros: No. Q. Did you know, as master of that ship, where it was? A. No, sir; I did not know where it was. Q. Did you send down a diver? A. Yes, sir. Q. How many times did the diver go down? A. I think some three or four times,—five, maybe. I don't remember exactly. That I could not say. Q. When he went down the first time, for what purpose did he go? A. He went to see if he could find anything wrong with the ship, or a hole in her,—the condition of her bottom as far as he could see. Q. Did he go down at any time for the purpose of stopping any leak that he might have found? A. I think he did; yes, sir. Q. So far as you know, he did stop it? A. As far as I know, he did. Q. After he had gone down for the purpose of stopping

the leak, and returned, did you then commence pumping her out for the purpose of floating her? A. After all the bulkhead doors were secured from the inside, we built a cofferdam around the forward hatch, and we pumped her out. Q. You had to build a cofferdam around her in order to free her hold from the water? A. Yes, sir. Q. When she was pumped out she would float, of course? A. Yes, sir. Q. How long after she was floated was it before she started to come to San Francisco? A. I think we were here in about forty-eight hours after she was floated. I think about forty-eight. Q. Did she leak coming up, to your knowledge? A. She made no water to my knowledge. \* \* \* Q. You testified, the other day, that an attempt was made to discover where the leak was by looking along the outside of the ship? A. Yes, sir. Q. Was that done by sending a man down in a bowline? I think you so testified. A. Yes, sir. Q. Did he go below the stringer of which you have spoken? A. No, sir. Q. Whereabouts is that stringer located with reference to the deadlights of the ship,—above them? A. Just above the deadlights. The deadlight is close up under the guard. It may be six or eight inches,—something like that, but not far from that."

Frank Mallow was called by the claimant, and testified that he was on the steamer on the voyage in question; that he was captain of the after hold; that his duty was to look after the freight, clean up the hold, clean the deadlights, and close them; that he performed that duty on this particular trip; that he saw that the deadlights were all properly closed upon that trip before the steamer sailed from San Francisco. He also explained how the glass and iron backs of the deadlights were fastened by means of a screw, and this screw set in place by a wrench or key.

A. Johansen, the carpenter, testified that it was his duty to go below and see that everything was all right at 8 o'clock at night. He made that inspection at 8 o'clock on the night after the vessel left San Francisco, visiting the vessel below, fore and aft, including the after between-decks. Everything was all right. No indications of water in the after between-decks at 8 o'clock that night.

It does not appear, from the testimony, that the vessel, after she left the port of San Francisco, met with any known accident or injury which would have caused a leak. She does not appear to have struck or come in contact with any rocks or other objects until she was beached at Port Harford, nor did she encounter such boisterous weather as would account for an opening in her side to which the leak could be attributed. It is true the captain testified that, after they sailed from San Francisco, they had some boisterous weather,—strong northwest winds,—a heavy nor'wester; but he admitted, on cross-examination, that it was the ordinary weather met with and expected at that season of the year, and no pretense is made, either by him or his counsel, that the leak could be rationally attributed to any injury produced by the weather then prevailing.

From what has been stated of the pleadings and testimony, it appears that the case has been tried upon such narrow lines that but few facts of substantial value have been disclosed to enable the court to arrive at a satisfactory conclusion as to the real and efficient cause of the disaster. Indeed, it may be said that the case did not reach that stage of proof where this particular question had been

fully developed as an issue. As the case progressed, the important question always presented was to determine the presumptions of law and fact, and on whom the burden of proof rested. The allegation of the libel is that the merchandise was returned to the port of San Francisco in a greatly damaged condition by reason of having been wet with sea water during the said voyage, which, through the negligence of said steamship company and its officers and servants. gained access to the interior of the said ship, where said merchandise was stowed. The burden of proving this allegation was upon the libelants; but, it being established that the merchandise had been returned to the port of shipment in a greatly damaged condition by reason of having been wet with sea water, a legal presumption of negligence arose which was attributed to the carrier because of this circumstance, and upon this presumption the libelants rested their case. But this legal presumption of negligence now placed upon the carrier was, based upon a presumption of fact, that the vessel, having become unfit to prosecute her voyage without being visibly exposed to any extraordinary perils or dangers of the sea, was in an unseaworthy condition when the voyage began. Work v. Leathers, 97 U. S. 379; Cort v. Insurance Co., 2 Wash. C. C. 375, Fed. Cas. No. 3,257; Paddock v. Insurance Co., 11 Pick. 227; The Planter, 2 Woods, 490, Fed. Cas. No. 11,207a. This presumption of fact was met by proof from the claimant that the vessel, as before stated, was a well-constructed, iron-screw steamer, built in 1882; that she was submitted to regular inspections once a year from the time she was built until the date of the accident; that she was rated by the board of United States inspectors, at the last inspection, on June 21, 1887, as "A1"; that the hull of a vessel of the construction of the Queen, properly repaired and cared for, would last from 50 to 60 years; that she was kept in proper repair, and, at the time she sailed from San Francisco, just previous to the accident, she was rated by her master as first-class,—the best that is given for an iron steamship; that, upon the return of the vessel to San Francisco immediately after the accident, she was examined by James Dickie, a competent shipbuilder of long experience, and the superintendent of the shipyard at the Union Iron Works, and, aside from the apparent effects of grounding at Port Harford, he found her in a remarkably good condition, and nothing to indicate unseaworthiness.

The testimony relating to the guard or fender on the outside of the vessel incidentally disclosed the fact that just below it were the deadlights. The condition of these deadlights then became a matter of some significance. Had one of them been negligently left open when the vessel sailed, the flow of the water through such an opening into the compartment might account for the leak; but the claimant introduced testimony tending to show that the deadlights were all closed when the vessel sailed from San Francisco, removing the presumption of unseaworthiness that might attach to the unexplained condition of these openings at that time. Here we reach the difficult point in this case. Upon whom now rests the burden

of proof? Has the carrier removed the presumption of negligence cast upon it by the return of the merchandise in a damaged condition, wet with sea water? Was it sufficient, to shift the burden of proof back upon the shipper, for the carrier to show that the vessel was in a seaworthy condition at the commencement of the voyage?

In the case of the Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, the libelant sought to recover for damages to a cargo caused by the vessel taking in water through a hole in her side made by the breaking away of a cap from one of the bilge-pump holes. The defense was, that such breaking was caused by a danger of the sea, within the exception in the charter party and bill of lading. The vessel was on a voyage from Weymouth, Mass., to Savannah, Ga., with a cargo of guano. She encountered some rough weather, and shipped large quantities of water, a portion of which found its way into the cargo through the bilge-pump hole. The circuit court found, as a fact, that before the vessel sailed the cap and plate appeared to be in good order, with no indication of looseness. The examination, which was at that time made of them, consisted of such inspection as could be given by the eye, and to such an inspection they were from time to time subjected. The court said:

"Perils of the sea were excepted by the charter party, but the burden of the proof was on the respondents to show that the vessel was in good condition, and suitable for the voyage, at its inception, and the exception did not exonerate them from liability for loss or damage from one of those perils to which their negligence, or that of their servants, contributed. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 438, 9 Sup. Ct. 469. It was for them to show affirmatively the safety of the cap and plate, and that they were carried away by extraordinary contingencies, not reasonably to have been anticipated. We do not understand, from the findings, that the severity of the weather encountered by the Morrison was anything more than was to be expected upon a voyage such as this, down that coast and in the winter season, or that she was subjected to any greater danger than a vessel so heavily loaded and with a hard cargo might have anticipated under the circumstances. The especial peril which seemed at one time to threaten her safety was directly attributable to the water taken on board through the uncovered bilge-pump hole."

The circuit court had determined that, as no one witnessed the removal of the bilge-pump hole plate, direct evidence of the cause of the mishap was not obtainable. It was to be inferred, however, from the facts proved, that it was knocked out by something striking violently against it. The supreme court, commenting upon the findings relating to this feature of the case, points out that they did not justify the conclusion reached by the circuit court, and explains why they were insufficient, in the following language:

"If, however, the vessel had been so inspected as to establish her seaworthiness when she entered upon her voyage, then, upon the presumption that that seaworthiness continued, the conclusion reached might follow; but we are of opinion that precisely here respondents fail in their case."

In the present case, the claimant has introduced testimony tending to establish the seaworthy condition of the vessel when she set out on her voyage, and this testimony has not been contradicted. Now, if the only presumption of negligence arising out of the damaged con-

dition of the merchandise was that the voyage had been commenced with a vessel in an unseaworthy condition, the court would be compelled to hold that the claimant had sufficiently answered the prima facie case made out by the libelants; but this does not appear to be the full scope of the presumption of negligence attributable to the carrier under this aspect of the case. Underlying the contract is the implied warranty, on the part of the carrier, to use due care and skill in navigating the vessel and in carrying goods, and it may be that, through some carelessness or negligence on the part of the carrier during the voyage, goods laden on board the vessel may suffer damage.

This brings us to a consideration of the behavior of the vessel after she left port. The testimony does not directly indicate any negligence on the part of the officers or crew in navigating the vessel, but it does seem to point to an open deadlight as the cause of the leak in the water-tight compartment. After the vessel had been beached at Port Harford, and while she was partially under water, a diver was sent down to examine her bottom and ascertain what was wrong with the vessel. He went down several times, and appears to have stopped the leak; for, after his final examination, all the bulkhead doors were secured from the inside, a cofferdam was built around the forward hatch, the water was pumped out, and the vessel floated. Forty-eight hours afterwards she had returned to San Francisco without any leak occurring on the return voyage, and, upon being examined on the dry dock at the Union Iron Works in San Francisco, she was found to be in a thoroughly seaworthy condition, aside from the effects of grounding. It is difficult to understand how a leak of such a serious character as to make it necessary to beach the vessel a few hours after its discovery could have been stopped so easily and quickly, if it had not been caused by some such aperture in the side of the vessel as an open deadlight, which being closed and properly fastened, and the vessel freed from water, she was again restored to a seaworthy condition.

But, even if this supposition as to the cause of the leak is correct, it does not necessarily determine the ultimate question whether the damage to the cargo from sea water was by reason of the negligence of the steamship company. The testimony is that all the deadlights of the vessel were properly closed and fastened before the vessel sailed from San Francisco. It is true that this testimony may be disregarded, if, under all the circumstances, it appears to be improbable. The witness who testified that the deadlights were closed may have been mistaken, or one or more of the deadlights may have been opened by some one after they had been closed and fastened by the person charged with this duty. Is the testimony improbable? The deadlights were located about six or eight inches under the guard or fender. As the vessel was loaded on this particular voyage, this guard or fender was a foot or a foot and a half above the water line. This would leave the deadlights from six to eight inches above the water when the vessel was in still water

and on an even keel. But, when the vessel was in motion and at sea, the water washed above the guard, and, of course, much more above the deadlight. The captain testified that the sea would wash over the guard, and away above it. He thought the sea would be above the guard four or five times a minute. If, then, a deadlight was open when the steamer set out on her voyage, the sea water must have commenced to flow through the opening very soon after she left her wharf; certainly when she reached the ocean outside the heads. The vessel sailed at 2 o'clock on the afternoon of April 29, 1888. At 8 o'clock on the evening of that day, the carpenter made his tour of inspection below, and found everything all right. There was no indication of water in the after between-decks at that time. It was not until 10 minutes past 2 on the morning of April 30th that the water tender discovered about a half gallon of water spread over a surface of three feet square on the floor of the engine room. He searched for the source of the water, and found that it had come through a small hole in the iron bulkhead of the starboard alley-way overhead. The hole was very near the bottom of the bulkhead and was about three eighths of an inch in diameter. At the time the attention of the water tender was attracted to the wet surface on the floor of the engine room, no water was coming through this hole, but a few minutes afterwards, when she rolled heavily to port, the water came through again. The flow was at first intermittent, conforming to the roll of the vessel. The captain testifies that this hole in the iron bulkhead, through which the water came into the engine room, was not three inches above the deck, in the alleyway of the compartment on the starboard side. This compartment was about 100 feet long by about 10 feet wide, and was stowed with cargo, probably of the miscellaneous character described in the libels. At 1 o'clock the captain was out on deck, but there was nothing at that time to indicate that there was anything wrong with the vessel. The officer of the deck reported that she had a little list to starboard, but there was nothing unusual in this condition, as the burning of coal from the port to the starboard side, or vice versa, would give the vessel a list from one side to the other. But, within an hour of the discovery of water on the floor of the engine room, the vessel took a permanent list to starboard, which she kept until she was beached. This testimony tends to show that the water had not been flowing very long into the compartment when the leak was first discovered. But, if the water came in through an open dead-light, when was the deadlight opened, and what opened it? The testimony tends to rebut the presumption that it could have been opened by any one after the vessel left port; but, on the other hand, if it had been broken open by the violence of some object coming into contact with it from the outside, there would have been some evidence of that fact in the condition of the deadlight after the accident, which the claimant could certainly have produced.

In the case of The Majestic, 20 U. S. App. 505, 9 C. C. A. 161, and 60 Fed. 624, the vessel was on a voyage from Liverpool to New York.

The baggage of the libelants was stowed in a compartment of the orlop deck. On arrival at New York, their trunks were found to be saturated with salt water, and damaged. During the voyage the vessel encountered some rough seas and passed through a quantity of wreckage. Soon after it was found that the after porthole in the compartment where the baggage was stowed had been broken, and that a large quantity of water had entered, and damaged the baggage. There were three portholes on each side of the compartment, which were closed in the usual way with thick glass and an iron cover, or dummy, screwed up tightly. The glass was broken in many fragments, and the iron dummy was forced from its hinges, and turned back. The district court (56 Fed. 244) held that the finding of two or three feet of water in the orlop compartment, where the baggage was stowed, was so extraordinary an occurrence that the burden of proof was upon the ship to satisfy the court, with a reasonable degree of certainty, that this occurred without her fault, and that the evidence in the case was not satisfactory on that point. The case was taken to the circuit court of appeals. That court held that:

"The facts that the glass was splintered into many fragments, and that the iron dummy was forced from the hinges and thrown backward, show that the accident must have been caused by a violent blow coming from the ocean. It is reasonable to infer that it was caused by an apparent and adequate cause, rather than by one which rests entirely upon surmise; and we are, therefore, led to conclude that a blow from one of the floating planks inflicted the injury. * * * It was an unanticipated peril of the sea."

In the present case, the evidence furnishes no such explanation of the extraordinary occurrence, and the court is compelled to decide the case upon the weight of presumptions. In fact, as the proof now stands, although claimant contends that the damage by sea water to the goods must be attributed to some accident or danger of the sea or of navigation, he has failed to show any accident, danger, or casualty of the sea from which the leak can be reasonably, or at all, inferred. Nor has he accounted for the leak at all, and, so far as the evidence in the case is concerned, the court is left in ignorance as to its cause. But, can it be said that the carrier, against whom a prima facie case of negligence has been made out, discharges the affirmative duty of bringing himself within one of the exceptions of the contract of affreightment by simply leaving the question as to whether or not the damage was caused by one of the excepted perils or dangers in doubt? I think not. The carrier does not thereby overcome the presumption of negligence which the law raises against him. He cannot absolve himself from blame by merely showing such a state of facts that the court is unable to deduce how and in what manner the damage has arisen. He must show affirmatively that the damage was caused by a peril of the sea or other cause excepted by the contract of affreightment, and this he must establish satisfactorily. He cannot leave the matter in doubt. As was aptly said in The Compta, 4 Sawy. 375, Fed. Cas. No. 3,069:

"The carrier, to make good his defense, is bound to show that the damage arose from a peril of the sea. It is not enough for him to show that it might have arisen from that cause. He must prove that it did."

In the case of The Centennial, 7 Fed. 601, the carrier was held responsible, under circumstances closely analogous to those in the case at bar, for having failed to prove distinctly that the damage to the cargo was caused by a peril of the sea. The case was on appeal to the circuit court. The facts were as follows:

"The three-masted schooner Centennial sailed from Cardenas, bound to Boston, on the 28th of May, 1879, with 800 hogsheads of muscovado sugar, of which the greater part was the property of the libelants. The cargo was properly stowed and well dunnaged. According to the log book, and all the evidence of the officers and crew, the pumps were tried every four hours, and the vessel made no water of any consequence until June 3d. On that day, at 4 o'clock in the afternoon, there was no water in the hold. At 8 o'clock of the same evening there were 7½ feet of water there, and the ship was apparently in immediate danger of foundering. Both sets of pumps were worked all that night by all hands, and in 11 hours the water had been lowered 2 feet. After this, the crew being exhausted, they kept watch and watch, and the forward pumps alone were kept in operation, and were able to prevent any increase above the 5½ feet until the vessel arrived at Philadelphia, a port of necessity, on the 6th of June. Here the schooner was pumped out, and her cargo was discharged, and it was found that some of her seams and butts were slack. No extraordinary injury was discovered. She was calked and reloaded, and brought her cargo to Boston, but it had already suffered the damage which the district court has found to be justly chargeable to the vessel."

Lowell, Circuit Judge, said, in the introductory part of his opinion:

"The duty of ascertaining the facts of this case is a difficult and delicate one. That a great loss has happened is certain, but its causes are so obscure that every possible theory offered to account for it is open to most plausible objection."

Then, after stating the facts as recited above, he continued:

"The libelant introduced evidence tending to show that the schooner was of a model and build unsuited to the heavy cargo of sugar which she undertook to carry, and that the calking of her seams had been neglected. The claimant met these allegations, and, upon the whole evidence, the district judge was of opinion that the schooner was, in these particulars, sufficient and suitable for the voyage. I am of the same opinion. But behind this is the question how so much water came into the vessel without being discovered. The condition of the vessel, when she was examined, would not account for seven feet of water being found in the hold four hours after it had been pumped dry, or found to be dry."

After taking up and discussing the various theories as to the cause of the leak, the learned judge proceeds:

"The district judge held that the owners of the ship had not explained the damage sufficiently to satisfy him that it had occurred by a peril of the sea, within the true intent of the bill of lading."

In this conclusion the circuit judge fully agreed, for he found, as matters of fact, (1) that the vessel was reasonably fit for the voyage in respect to her build and calking, and (2) that the claimants (the shipowners) have failed to prove distinctly that the damage to the cargo was caused by perils of the sea; and he affirmed the decree of the district court holding the vessel liable for the damage sustained to the cargo of sugar.

In the case at bar, as in the case cited, the carrier sets up a peril of the sea, but fails to explain the cause of the damage sufficiently to justify the court in holding that the leak is attributable to any accident, danger, or peril of the sea or of navigation.

In The Mascotte, 2 C. C. A. 399, 51 Fed. 605, the same principle was affirmed. A libel had been brought against the steamship Mascotte for damages to the cargo. The district court entered a decree for libelants. In the course of his opinion (48 Fed. 119) the district judge (Brown) said:

"As respects the claim for damage to tea caused by oil, the bill of lading, as well as the master's testimony, shows that the chests were received on board in good condition. Some of the chests, on delivery, were, beyond doubt, oil-stained and defaced. All that the claimants can do to exonerate the ship has doubtless been done; but, after all, the evidence shows nothing more than that they cannot explain how the stains and defacing occurred. It negatives certain causes that might, under some circumstances, have produced the damage; but this is not, I think, sufficient to release the ship of her legal obligation. The ship has possession and control of the goods from the time they are delivered into her custody. If the goods are received in good condition, as this bill of lading shows they were, she warrants their delivery in like condition, unless damaged through the act of God, public enemies, the dangers of the seas, or through some other excepted cause. Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 437, 9 Sup. Ct. 469. The burden of showing that the damage arose from such an excepted cause is upon the ship. Nelson v. Woodruff, 1 Black, 156. As the Mascotte's evidence does not show this, but merely leaves the damage unexplained, I must, therefore, hold the ship liable for this item."

On appeal to the circuit court of appeals, that court affirmed the decree of the lower court in the following concise opinion:

"We agree with the learned district judge who decided this case in the court below that the libelants have a sufficient case for the recovery of their damages, by reason of nondelivery of their cargo in good order and condition. The burden of proof is on the steamship to overcome the effect of the acknowledgment in the bill of lading of the reception of the goods on board 'in good order and condition,' and the evidence introduced on her behalf is not sufficient to overcome the effect of this recital."

In Hastings v. Pepper, 11 Pick. 44, Chief Justice Shaw probably carried the rule to its utmost limit when he said that:

"Negligence and breach of contract being proved, the defendant is bound to stand the loss, unless he can prove clearly that the loss was in no way attributable to that cause, or, rather, to prove affirmatively, and beyond reasonable doubt, what was the cause of the loss."

The cases of The Samuel E. Spring, 29 Fed. 397, and of The Lydian Monarch, 23 Fed. 298, are also very much in point, and the vessels in both of those cases were held liable for failing to show that the damage to the goods shipped on board had been caused by a peril of the sea.

Counsel for claimant cites and quotes from the case of Kenedy v. The R. D. Bibber, 2 C. C. A. 50, 50 Fed. 841, the following language:

"If, on the whole, it is left in doubt what the cause of the injury was, or if it can as well be attributed to perils of the sea as to negligence, the plaintiff cannot recover."

But this language is plainly inapplicable to the case at bar, for the simple reason that the claimant has failed to establish such facts from which a peril of the sea can be reasonably, or at all, predicated.

The contention of claimant that the libelants, having alleged negligence, must prove it affirmatively, and that they cannot rely merely upon the prima facie presumption of negligence which the law raises

upon proof of the return of the goods in a damaged state, is not tenable; for, if this were so, it would do away entirely with the prima facie presumption of negligence against the carrier.   As is well said in Hall v. Railroad Cos., 13 Wall. 372:

"When a loss occurs, unless by act of God or of public enemy, he [the carrier] is always in fault. The law raises against him a conclusive presumption of misconduct or breach of duty in relation to every loss not caused by excepted perils. Even if innocent in fact, he has consented by his contract to be dealt with as if he were not so."

It would, therefore, be enunciating a somewhat novel doctrine to say that a shipper is called upon to prove affirmatively that which, upon certain preliminary proof, the law presumes against the carrier. I am of the opinion that the claimant (the carrier) has failed in his proofs to bring himself within the exception, claimed by him, of a peril of the sea.

It is further contended, with respect to the libel of the firm of Hellman, Haas & Co., that the loss sustained by them was paid by the insurance company—which is the real party suing in this case—prior to the dissolution, by the death of one of its members, of the insured partnership; and it is claimed that, in such a case, the surviving partners—the firm no longer being interested in the result of the suit—have no authority to sue, the authority of the surviving partners being limited to a settlement of the partnership affairs, as provided by sections 2458–2462, Civ. Code Cal.   It is argued that, under such conditions, the insurer, having paid the loss and thereby become subrogated to the partnership rights during the lifetime of Jacob Haas, had the right to sue in the partnership name so long as the partnership existed, but that it could not sue, as it has done in this case, in the name of the surviving partners of the deceased partnership.   When the insurance company paid the loss sustained by the goods shipped by Hellman, Haas & Co., it became subrogated in a corresponding amount to the assured's right of action against the carrier, without any formal assignment or any express stipulation to that effect in the policy of insurance, and might assert that right to sue in its own name in a court of admiralty.   Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 9 Sup. Ct. 469.   It is also equally well settled that an insurer of goods is entitled, after he has paid the loss, to recover what he has paid, in a suit in the name of the assured (as in the case at bar) against the carrier.   Hall v. Railroad Cos., 13 Wall. 367.   Having become subrogated to the right of the assured partnership during the lifetime of all the partners, the death of one of the partners subsequent to the loss and its payment by the insurance company should not prejudice its rights, or prevent it from recovering from the carrier for the loss sustained to the goods.   The right to sue accrued before the death of the partner, and I am of the opinion that the insurance company has the right to use the name of the partnership firm in bringing this suit against the carrier.

It is also contended by claimant that the method employed by Hellman, Haas & Co. to ascertain the value of their damaged shipment,

which was by a sale at public auction, was not a proper one, and that the proceeds of that sale do not represent the true market value of the damaged goods. I do not understand that the regularity or fairness of the sale is impugned, nor that any more could have been obtained for them at private sale. It is difficult to see what good an appraisement would have subserved, for the goods, in their damaged, and some of them in their deteriorating, condition, had to be sold, and what they brought at public auction is probably the best indication of their actual market market value. As was very correctly said in The Columbus, 1 Abb. Adm. 37, Fed. Cas. No. 3,041, by Betts, District Judge:

"Sale by auction is, in the great marts of commerce, so commonly resorted to by merchants to ascertain the value of deteriorated merchandise that it may almost amount to a usage of trade. It furnishes, cheaply and promptly, all the accuracy which can be expected in any known measure of damages, and it is peculiarly fitting, in cases of this character, that the court should sanction and sustain it as the method best adapted to protect the interests of all parties concerned."

This contention will, therefore, be overruled.

The objection, that the steamer was not within the jurisdiction of the court when the libel was filed, it being claimed that she was without the Northern district of California, was also renewed upon the final arguments. The objection was urged, and decided adversely to claimant, when the exceptions to the libel were presented and passed upon. See opinion, 61 Fed. 213, 214. When the libelants put in their case, they introduced some testimony tending to establish that the vessel was within the jurisdiction of the court when the libel was filed. See opinion on motion for a judgment in favor of claimant, 75 Fed. 74, 75. Nothing that the testimony in the case has developed since the motion for a judgment in favor of claimant was denied has led me to alter my views and decision in this regard.

Upon the whole of the case, I am of the opinion that the libelants have made out their case, within the rules of law, against the claimant, and that the latter has failed to bring himself within any of the exceptions, provided by the shipping receipts or contracts of affreightment, which would relieve him from liability for the damages sustained to the various shipments made on board the steamer Queen, under the contracts referred to. Let a decree be entered in favor of libelants, and let the case be referred to the commissioner to ascertain the damages suffered by each shipment, unless the parties can reach some understanding and agreement respecting the amount of damages to be awarded.