## Case No. 11,207a.

### The PLANTER.

### [2 Woods, 490.] [1]

Circuit Court, S. D. Alabama. Dec. Term, 1874.

SHIPPING — SEAWORTHINESS OF VESSEL — AFFREIGHTMENT — LIABILITY FOR LOSS — IMPLIED WARRANTY—UNDERWRITER'S RIGHTS—SUBROGATION.

1. A vessel is unseaworthy that is not manned by the necessary officers and crew, but no recovery can be had against her on that account for a loss that was not attributable to such deficiency.

[Cited in Holland v. Seven Hundred and Twenty-Five Tons of Coal, 36 Fed. 787.]

2. The fact that a vessel without having encountered any tempestuous weather, suddenly springs aleak within twenty hours after leaving port, so that her officers are compelled, in order to save her from sinking, to throw overboard more than one-third her cargo, raises the presumption that she was unseaworthy when she commenced her voyage.

3. The fact that a vessel is not a common carrier does not relieve her from the warranty implied in a contract of affreightment, that she is sound, staunch and seaworthy.

4. When the underwriters have paid the loss, a suit may be maintained in the name of the insured for their benefit, against the vessel through whose fault the loss occurred.

[See Amazon Ins. Co. v. The Iron Mountain, Case No. 270.]

[Appeal from the district court of the United States for the Southern district of Alabama.]

On November 7, 1871, the libellant, the West India and Pacific Steamship Transportation Company, Limited, had possession of and a special ownership in 889 bales of cotton in the city of New Orleans, which it desired to have transported and delivered to the steamship Australian, lying in Mobile Bay. At the date named, the steamer Planter was lying in the port of New Orleans, and her master received on board of her, from the libellant, the 889 bales of cotton to be transported and delivered as aforesaid. Early in the evening of November 7, the Planter left the port of New Orleans with the cotton on board. She proceeded on her voyage that evening and night, tne weather being neither stormy nor unusually rough. A little before day of the morning of November 8, the Planter, then being in Missisippi Sound, was examined and found not to be leaking. As soon, however, as she got opposite one of the passes between the Gulf and the Sound, where the water was rougher, at about 6 o'clock a. m., she was found to be leaking rapidly. All her pumps were at once set going, but they could not keep down the water. The master headed her for the land, but she soon became waterlogged and unmanageable, and came to anchor in ten feet water. It soon became apparent that she must be lightened or she would sink. Accordingly 359 bales of cotton were thrown overboard. The consequence was, that the leakage diminished, the pumps gained on the water, and the steamer became manageable, and was run into the port of Ocean Springs. The next day, having been pumped dry, she proceeded on her voyage and delivered the residue of her cargo in good order to the Australian. Of the cotton jettisoned, seven bales were lost. The others were recovered in a. damaged condition. To recover for the loss and damage was the purpose of this suit.

Wm. G. Jones and Peter Hamilton, for libellant.

[1] [Reported by Hon. William B. Woods. Circuit Judge, and here reprinted by permission.]

Thomas H. Herndon and John Little Smith, for claimants.

WOODS, Circuit Judge. The libellant claims, that by the contract of affreightment, there was an implied warranty of seaworthiness on the part of the master and owners of the Planter, and that at the time of the receipt of the cotton on board, and during the voyage, she was unseaworthy (1) because she was not staunch and sound, and (2) because she was not provided with the necessary officers and crew; and that being unseaworthy, she must be held to respond in damages for the loss.

It is unnecessary to consider whether the Planter was fully manned or not, because there is no evidence that any deficiency of officers and crew contributed to the disaster, and without such proof there can be no recovery. 2 Pars. Mar. Law, 142, 143, note 1; Id. 151, note. I therefore proceed to consider the question, was the Planter staunch, sound and seaworthy at the time of the contract of affreightment? That she did not make the voyage and deliver her cargo according to the contract of affreightment is not disputed. Without having encountered any tempestuous weather, she suddenly sprung aleak within less than twenty hours after leaving port, so that her officers were compelled, in order to save her from sinking, to throw over more than one-third of her cargo. These facts raise the presumption that she was unseaworthy when she started, and throw on claimants the burden of proof to show that she was seaworthy. 2 Pars. Mar. Law, 138, 139; 1 Arn. Ins. 689-691. This the claimants have attempted to prove by evidence tending to show that in coming through the canal leading from New Orleans to the lake, she ran upon a snag or her wheel picked up a stump, and that in consequence one of her knuckle chains was broken, by which the seams along her kelson were opened. The evidence on this point is the merest conjecture. There is no proof that the knuckle chain was broken at that time, and the effect attributed to the breaking of the knuckle chain by the witness for claimant is denied by some of the witnesses for libellant.

It is in evidence, that there were six or seven knuckle chains in the Planter. The breaking of a single chain would not, it seems to me, be sufficient to account for the results which followed. But the conclusive answer to the theory of the claimants, that the vessel sprung aleak from the breaking of one of her knuckle chains, after the voyage commenced, is found in the following facts: Early in October, 1871, about one month before the voyage from New Orleans to the Australian, the Planter made a trip from Stockton, on the Tensas river, above Mobile, to New Orleans, with a quantity of wood and lumber, making a cargo of about one-third her capacity. She ran from Stockton to the obstructions at the head of Mobile

Bay over smooth water with no unusual leakage. She lay all night at the obstructions, and next day proceeded down the bay. A stiff norther commenced to blow and the waves to run high. She had not proceeded more than ten miles down the bay when she commenced to leak rapidly; so much so that it was necessary to run her in towards the western shore in shallow and more quiet water. She was brought to anchor with her head to the wind, and all her pumps set going. After a few hours she was clear of water and proceeded on her voyage. These two voyages of the Planter demonstrate, it seems to me, that there was some material defect in her hull, from which, whenever she encountered a rough sea, she sprang aleak. When the Planter was docked, a few days after her trip from New Orleans to the Australian, she was found to have a rotten plank under her fender in which were holes of considerable size. These holes were a foot above the load-water line, and could not be discovered from the inside on account of the sheeting, nor from the outside on account of the wheel and fender. The situation of these holes appears to account for the fact that she did not leak in smooth water, and to account for her sudden leakage when she got into rough water.

My conclusion from the evidence is, therefore, that when the contract of affreightment was made, and the cargo received on board, the Planter was not staunch, sound and seaworthy.

It is conceded by the claimants that when a vessel is a common carrier, there is an implied warranty of seaworthiness, but they say that this warranty does not arise unless the ship is a common carrier. In my judgment, the authorities do not sustain this view. The warranty of seaworthiness does not depend upon the common law notions of a common carrier. The common law does not give a lien upon the instrument of carriage; there is no lien on a railroad car or wagon. The rule insisted on by libellant is the creature of the admiralty, and exists in all cases of affreightment on vessels. The vessel is hypothecated to the shipper for his security that the contract will be performed by the ship, viz. that the ship will carry the goods in safety, in due season, and by the proper route; that she is in all respects seaworthy, and has a proper master and crew who will take good care of the cargo and properly deliver it. The vessel is subject to a lien in favor of the shipper that he may enforce this contract, as well as the goods to the vessel, for the payment of charges for carriage. 1 Pars. Shipp. & Adm. 171, 172, and notes; The Keokuk, 9 Wall. [76 U. S.] 517; Dupont de Nemours & Co. v. Vance, 19 How. [60 U. S.] 162; The Rebecca [Case No. 11,619]; Fland. Mar. Law, § 204.

I am of opinion, therefore, that the fact that the Planter was not a common carrier does not relieve her owners from the implied

warranty that she was staunch, sound and seaworthy.

It is objected by claimants that the libellant had insurance on the cotton, and, having been paid for the loss, cannot maintain this action. The record shows insurance, but does not show payment of the loss. But if libellant had been fully paid, this suit might be maintained in his name for the benefit of the underwriters by way of subrogation. 2 Phil. Ins. §§ 1723–1725, 1728, 1729; Hall v. Railroad Co., 13 Wall. [80 U. S.] 367; Hart v. Western R. Co., 13 Metc. [Mass.] 99; Garrison v. Memphis Ins. Co., 19 How. [60 U. S.] 317.

My conclusion is, therefore, that there must be a decree for libellant for the value of the seven bales of cotton lost, and for the damage sustained by the 352 bales jettisoned and recovered, deducting therefrom the amount due as freight upon the cotton actually delivered to the Australian.