## THE ARCTIC BIRD.

### A CERTAIN BARGE.

(District Court, N. D. California. May 27, 1901.)

1. SHIPPING—LOSS OF CARGO—UNSEAWORTHINESS.

The sinking of a barge, with her cargo, six hours after starting on a voyage, having been towed in smooth water during that time, cannot be attributed to a "peril of the sea," which has reference to such extraordinary perils as cannot be guarded against by the ordinary exertions of human skill and prudence, but must be presumed to have resulted from unseaworthiness at the beginning of the voyage.

2. SAME—CONTRACT OF CARRIAGE—BILL OF LADING.

Where goods were delivered to and laden upon a vessel for shipment, and a receipt given therefor, under a written contract for their carriage between the shipper and carrier, the terms of such contract cannot be changed, and new conditions and limitations favorable to the carrier added, by a bill of lading subsequently delivered by it to the shipper, and accepted by him without reading, unless it is shown that his attention was called to such changes, so that he may be presumed to have assented thereto.

3. SAME—LOSS OF GOODS IN SHIPMENT—MEASURE OF DAMAGES.

The measure of damages for goods lost in shipment, on which the freight had been prepaid, is their market value at the place of destination at the time when they should have been delivered, with interest from that date, and, in the absence of proof of such value, it will be presumed to have been their value at the place of shipment, with the freight added.

4. SAME—CONDITION OF LIABILITY—TIME FOR PRESENTING CLAIM.

A carrier of goods has the right to provide by contract that any claim for damages on account of loss or injury to the goods in shipment shall be presented within a reasonable time therein fixed, as a condition precedent to the right to maintain an action thereon, and a

provision of a bill of lading requiring such presentation within 10 days after the shipper has notice of the loss or injury is reasonable, and will be enforced.

5. SAME—BILL OF LADING—LIMITATION OF LIABILITY FOR UNSEAWORTHINESS.
    Under a provision of a bill of lading for goods to be carried by water, limiting the warranty of seaworthiness of the vessels to the exercise of reasonable efforts by the carrier to make them seaworthy, such carrier is not liable for the loss of the goods, through the unseaworthiness of a barge which it had built, where it exercised reasonable care in the selection of the materials, and the designer and workmen by whom it was built.

In Admiralty. Petition for exemption from liability and for limitation of liability on account of loss of cargo by the sinking of a barge.

Andros & Frank, for petitioner.

George A. Rankin and Page, McCutchen, Harding & Knight, for claimants.

DE HAVEN, District Judge. This proceeding was commenced by the owners of the steamer Arctic Bird and a certain barge to obtain the judgment of the court that they are not liable for any damage caused by the sinking of the barge referred to, and the loss of goods and merchandise carried thereon at the time, or, in the event that it shall be determined that they are not entitled to such relief, then for a judgment limiting their liability to the amount of the value of the interest of such owners in the steamer and barge and in their freight then pending. The petition alleges that on July 26, 1898, the Arctic Bird, with the barge in tow, laden with an assorted cargo, left Kotzebue Sound, in Alaska, for a voyage to the head of navigation on the Kubuk river; that the steamer and barge were properly manned and equipped, and in all respects seaworthy, and that upon such voyage the barge was wrecked by perils of the sea, and her cargo lost; that the goods lost were shipped under bills of lading, which contained the following stipulations:

"All claims for damage to, or loss of, any property to be presented to the carrier within ten days from date of notice thereof (the arrival of vessel at port or place of discharge or the knowledge of the stranding or loss of vessel to be deemed notice), and that after sixty days from such date no action, suit, or proceeding in any court of justice shall be brought for any damage or loss of said property; and a failure to present such claim within said ten days, or to bring suit within said sixty days, shall be deemed a conclusive bar and release to all right to recover against the vessel or its master, said carrier, or any of the stockholders thereof, for any damage or loss. * * * It is understood that the carrier's vessels are warranted seaworthy only so far as due care in the appointment or selection of agents, superintendents, pilots, masters, officers, engineers, and crew can secure it; and the carrier shall not be liable for loss, detention, or damage arising, directly or indirectly, from latent defects in boilers, machinery, or any part of the vessel, provided reasonable measures have been taken to secure efficiency."

The petition further sets forth that petitioners observed due care in the appointment and selection of the master and crew of the barge, and employed reasonable measures to secure the efficiency of her body, tackle, and apparel; and it is further alleged that neither of the owners of the goods lost presented any claim to petitioners for damages on account of such loss, within the time specified in the

bills of lading, and also failed to bring suit within the time therein limited. Certain of the owners of the goods and merchandise carried by the barge presented their claims for damages in due form to the commissioner, and also answered the petition, contesting the claim of the petitioners for exemption from liability, and also their claim for a limitation of liability.

1. Upon these issues, the first question to be determined is the claim of the petitioners for exemption from all liability for the damage occasioned by the sinking of the barge. 2 Fost. Fed. Prac. § 437. There are three claimants, who seek in this proceeding to recover damages,—Rankin, O'Connor, and Snow. The questions arising upon the claim of Rankin will be first considered.

The following facts are disclosed by the evidence: The steamer Arctic Bird, with the barge in tow, left Kotzebue Sound, July 26, 1898, bound for the head of navigation on the Kubuk river. The barge had on board goods and merchandise belonging to the claimant Rankin, and after it had proceeded on the voyage for six hours sunk in Hothan Inlet, and the cargo which it carried was thereby lost. It had received no injury from hidden rocks or other obstructions, and no strong wind or rough sea had been encountered. It was being towed at the rate of five miles an hour, and sunk in the smooth water of the inlet, within 30 minutes after the discovery of the fact that it was leaking and in distress. The barge afterwards drifted ashore, and, when found one week after the disaster, appeared stanch in every respect, except that the upper stern plank did not connect closely with the beveled end of the upper plank on the port side, and by reason of this there was at that time an open seam between the two planks one-half inch in width, and three or four inches in length.

The contention of petitioners that the barge was seaworthy, and that its loss was occasioned by a peril of the sea, cannot, in view of the foregoing facts, be sustained. The phrase "perils of the sea" has reference only to "those accidents peculiar to navigation, that are of an extraordinary character, or arise from irresistible force or overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence." Transportation Co. v. Tuckerman, 33 N. J. Law, 543; The Reeside, 2 Sumn. 567, Fed. Cas. No. 11,657. It is clear that the sinking of the barge, under the circumstances above stated, cannot be attributed to a peril of the sea, and it is equally clear that the cause of the disaster was the unseaworthiness of the barge. Seaworthiness has been defined as "that quality of a ship which fits it for carrying safely the particular merchandise which it takes on board" (The Thames, 10 C. C. A. 232, 61 Fed. 1014); or, in the language of Baron Parke, to be seaworthy a vessel must be "in a fit state as to repairs, equipment, and crew, and in all other respects, to encounter the ordinary perils of the voyage insured, at the time of sailing upon it" (Dixon v. Sadler, 5 Mees. & W. 405). And in Dupont De Nemours v. Vance, 19 How. 162, 15 L. Ed. 584, the supreme court said: "To constitute seaworthiness of the hull of a vessel in respect to cargo, the hull must be so tight, stanch, and strong as to be competent to resist all ordinary action of the sea, and to prosecute and complete the voyage without damage

to the cargo under deck. \* \* \*" In view of this rule, as to what constitutes seaworthiness, it has been uniformly held that if a vessel springs a leak, and founders, soon after starting upon her voyage, without having encountered any storm or other peril to which the leak can be attributed, the presumption is that she was unseaworthy when she sailed. The Planter, 2 Woods, 490, Fed. Cas. No. 11,207a; Talcott v. Insurance Co., 2 Johns. 124, 3 Am. Dec. 406; Cort v. Insurance Co., 2 Wash. C. C. 375, Fed. Cas. No. 3,257; Walsh v. Insurance Co., 32 N. Y. 427; Paddock v. Insurance Co., 11 Pick. 227; Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012. Thus, in the case last cited, the court said: "If a defect without any apparent cause be developed, it is to be presumed it existed when the service began." So, also, in the case of Walsh v. Insurance Co., 32 N. Y. 436, the court observed: "Where the inability of a ship to perform a voyage becomes evident soon after leaving port, and it founders without stress of weather or other adequate cause of injury, the presumption is that this inability existed before setting sail, and that it is due to some latent defect which rendered the vessel unseaworthy." The barge, when unloaded and just before the commencement of the voyage upon which it was lost, was towed a distance of 12 miles without leaking. This is relied upon by the petitioners as proof of its seaworthiness, but can be given no such effect in the face of the fact that the barge sunk without having encountered a peril of the sea. In my opinion, but one conclusion can be drawn from the evidence, and that is that the barge was unseaworthy. Its foundering, under the circumstances stated, can only be accounted for upon the theory that it was not strong enough to sustain the strain to which it was subjected by the towage and weight of its cargo.

2. The remaining defense to the claim of Rankin is based upon the bill of lading set forth in the petition, and as he did not present to petitioners his claim for damage within the time specified therein, and also because of the provisions of the bill of lading, in effect restricting the warranty of the seaworthiness of the vessels upon which the goods were to be carried to reasonable efforts upon the part of petitioners to make them seaworthy, the question whether the goods were shipped under such bill of lading is a vital one. The following are the facts upon which its decision depends:

On May 17, 1898, Rankin and one F. M. Stone submitted to F. S. Johnson, of the Johnson-Locke Mercantile Company, agent of petitioners, the following written memorandum:

"San Francisco, May 17, 1898.

"Frank S. Johnson, Esq., Pres. Johnson-Locke Mer. Co.—Dear Sir: Referring to our verbal conversation, we understand the propositions of your company to be as follows: For a consideration of two hundred dollars fare per passenger, and eighty dollars per ton freight, you agree to carry us and our freight to Kotzebue Sound by the steamship Grace Dollar, and thence by a river steamer from the landing of the Grace Dollar, to and up the Kubuk river, to a point known as 'Fort Cosmos,' or as near thereto as river navigation may admit. On the Grace Dollar we are entitled to stateroom No. ——; and there shall be no other passengers in that room. We are to be at no expense for provisions until landed at the head of navigation. Until put aboard the river steamer we are entitled to have our food cooked and served, but on the river steamer we are to do our own cooking, you providing a

stove for the purpose, but we are to have equal accommodations with other passengers. In so much as you expect that it will require more than one trip of your river steamer to carry all, the passengers and freight taken by the Grace Dollar, you agree that we shall be taken up the river on the first trip, together with our wearing apparel and sufficient supplies to last us sixty days. The portion of our freight not taken up the river on the first steamer you agree to properly care for and protect from the weather, and on the second trip and within thirty days, to take the same up the river to the head of navigation, and there to properly protect and store the same, subject to our further order. We are to have the privilege of taking one servant, who shall cook and wait upon the table of the Grace Dollar, which service shall be in full for his fare free. We are allowed three hundred pounds of freight and our stateroom baggage free of charge. We are also allowed to take on small boat. We are to be allowed a rebate of thirty dollars each from the above figure, and any freight more or less than two tons to be taken at the rate of eighty dollars per ton. George A. Rankin.
"Frank M. Stone."

To this the Johnson-Locke Mercantile Co., immediately replied as follows:

"San Francisco, May 17th, 1898.

"Messrs. Geo. A. Rankin and F. M. Stone, San Francisco, Cal.—Dear Sirs: Acknowledging receipt of your esteemed favor of May 17th, reciting the terms under which you purchased tickets from us for Kotzebue Sound and head of steamboat navigation on the Putnam river, we beg to confirm same in all respects, save that portion of your letter which recites the fact that the second trip on the Putnam river must be made within thirty days after the first trip. We shall do our utmost to make this trip within thirty days, and agree to use all expedition possible in returning with the Arctic Bird from her up-river trip to the mouth of the river, and there re-embark passengers and freight for the second trip. We are not accountable for the acts of God or the accidents of navigation, and these, in our opinion, will be the only causes that will prevent our making the trip within thirty days. We can only agree, however, to make the return trip, and deliver the remainder of your freight on the second trip. We are yours, very truly,
"Johnson-Locke Mercantile Co.,
"Per F. S. Johnson."

Stone for some reason concluded not to go upon the voyage referred to, and Rankin was then informed by the agent of petitioners that the action of Stone would not affect him, and that he and his freight would be carried by petitioners upon the terms stated in the foregoing letters. Within a day or two after receiving this assurance, Rankin paid the sum of $200 for his passage, and on or before June 7, 1898, delivered his goods to the petitioners on board the steamer Grace Dollar, for carriage from San Francisco to Ft. Cosmos, or the head of navigation on the Kubuk river. When the goods were received for shipment, the Grace Dollar issued a receipt therefor, which recited that they were to be delivered to Rankin at the port of destination, "dangers of fire and navigation, or any other accident or danger of the seas, rivers, or steam navigation, of whatever kind or nature, excepted, and with privilege of reshipping on steamboats or barges." This receipt contained no other exceptions. After the goods had been laden on board the Grace Dollar, Rankin, on June 7th, paid the freight thereon, and, upon requesting a receipt for the money paid, was given the bill of lading set out in the petition. His attention was not called to the stipulations contained therein, nor was he informed that petitioners desired to add

to or change the terms upon which they had offered, in the letters above referred to, to carry his goods. The bill of lading was not signed by Rankin, and he did not examine it any further than to see that it contained a receipt for the freight shipped and the money paid by him.

The petitioners claim that the bill of lading delivered to Rankin, under the circumstances just stated, constitutes the agreement under which his goods were to be carried, and in support of this contention cases are cited in which it has been held that, "when goods are delivered to a carrier for transportation, and a bill of lading or receipt is delivered to the shipper, he is bound to examine it and ascertain its contents; and, if he accepts it without objection, he is bound by its terms, and resort cannot be had to prior parol negotiations to vary them." Germania Fire Ins. Co. v. Memphis & C. R. Co., 72 N. Y. 90, 28 Am. Rep. 113; Long v. Railroad Co., 50 N. Y. 76; Bank of Kentucky v. Adams Exp. Co., 93 U. S. 174, 23 L. Ed. 872; Grace v. Adams, 100 Mass. 505, 97 Am. Dec. 117, 1 Am. Rep. 131; McMillan v. Railroad Co., 16 Mich. 79, 93 Am. Dec. 208. In the case of The Henry B. Hyde (D. C.) 82 Fed. 681, the court, in speaking of the legal effect of a bill of lading, and why, upon principle, such an instrument is binding upon the shipper, said:

"It is the rule, rather than the exception, for common carriers to stipulate for a release from the stringent liability of an insurer, and which otherwise the law would impose upon them; and, according to the customary course of business, such stipulations are contained in the bill of lading issued by the carrier. This custom is so general that all persons receiving such bills of lading must be presumed to know such custom, * * * and for this reason the acceptance of such a paper by the shipper, without dissent, at the time of the delivery of his goods for shipment, when no fraud or imposition has been practiced upon him, is to be regarded as conclusive evidence that he agrees to be bound by all lawful stipulations contained in such bill of lading."

The present case does not fall within the reason of the rule under discussion in the case just cited. It very clearly appears that, prior to the issuance of the bill of lading, the goods had already been laden on board the Grace Dollar for carriage, upon the terms named in the letter of Stone and Rankin, and in the reply made thereto by the Johnson-Locke Mercantile Company. These letters, it is true, do not show upon their face a completed contract for the transportation of Rankin's freight, and are to be construed only as an offer upon the part of petitioners to transport it. Railroad Co. v. Dane, 43 N. Y. 240. When, however, this offer was accepted by Rankin, and his freight actually delivered to, and received by, petitioners in pursuance thereof, the contract of carriage upon the terms stated in the letters was complete. But, while this was the contract under which the freight was received on board the Grace Dollar, it was nevertheless competent for the parties to modify it by the introduction of additional terms, or by the substitution of the contract contained in the bill of lading. The question is, was this done? or, stated in other words, do the circumstances under which the bill of lading was delivered show that it was the intention of the parties that the prior contract was to be merged in, and the freight carried subject to the

conditions and exceptions named in, the bill of lading? In my opinion, this question must receive a negative answer. There was no express agreement that the prior contract was to be added to, or superseded by, the bill of lading, and, under the particular circumstances shown here, an agreement to that effect will not be implied from the fact that the bill of lading was delivered to, and received by, Rankin without dissent. Upon its facts, this case is similar in principle to that of Bostwick v. Railroad Co., 45 N. Y. 712. The court in that case said:

"There was no contradiction attempted by the evidence of the plaintiff that he made a verbal contract with Cooke for the transportation of the fifty-four bales through to New York, 'all rail,' and agreed to pay the all-rail rate. The goods were shipped under this verbal agreement, before any written contract or bill of lading had been tendered to the plaintiff. The verbal agreement had been acted upon, and under it the plaintiff had parted with all control over his goods. The rule that prior negotiations are merged in a subsequent written contract does not apply to such case as this. If the plaintiff had expressly assented to the terms of the bill of lading subsequently delivered to him, such assent would operate as a change of the terms of the contract originally made, and under which he had parted with his property. But after the verbal agreement had been consummated, and rights had accrued under it, the mere receipt of the bill of lading, inadvertently omitting to examine the printed conditions, was not sufficient to conclude the plaintiff from showing what the actual agreement was under which the goods had been shipped."

In some later cases in New York, the doctrine of the case just cited is said to be applicable only to cases when the evidence shows that at the time of the delivery of the bill of lading the goods were actually in transit to their place of destination, and for that reason could not have been reclaimed by the shipper. Germania Fire Ins. Co. v. Memphis & C. R. Co., 72 N. Y. 90, 28 Am. Rep. 113; Long v. Railroad Co., 50 N. Y. 76. I do not think, however, that the case should be so limited. When the claim is made that a contract under which goods were accepted by a carrier for transportation has been superseded by a bill of lading subsequently delivered, it is certainly reasonable to require, in support of such claim, proof of the actual assent of the shipper to the terms contained in the bill of lading. In such a case, proof of the delivery of the bill of lading, and its retention by the shipper without dissent, will not be sufficient, but it must be shown, in addition thereto, that he had notice that such bill of lading was delivered to him by the carrier as the contract under which his goods were to be carried. There are many cases which so hold. Thus, in the case of Railway Co. v. Beeson, 30 Kan. 298, 2 Pac. 496, it appeared that a verbal contract had been made with the Missouri Pacific Railway Company to ship wool from Kansas to Philadelphia at a stipulated rate. The wool was delivered to the company, and placed on its cars, and, after this, the company delivered to the shipper a bill of lading, which recited that the wool was only to be carried by the company to "St. Louis station." The bill of lading was accepted by the shipper without reading and without objection. The precise question before the court was whether, under such circumstances, the wool was shipped under the prior oral agreement, or under that contained in the bill of lading, and in its decision the court said:

"If no previous contract had been made between the parties, the bill of lading would be conclusive evidence as to the character of the contract between the parties. And, possibly, if the defendant or its agents had called the attention of the plaintiff to the particular words in the bill of lading showing that the wool was to be carried to St. Louis station, or if the plaintiff at the time of receiving the bills of lading had read the same and made no objection thereto, the bill of lading might be considered as conclusive evidence of the character and extent of the contract between the parties. But a bill of lading signed by one party only, read by one party only, and understood by one party only, can hardly be held to overturn and destroy a previous contract entered into by and between both the parties, when the original contract has been principally executed and fulfilled on the part of one of the parties, and by that one who did not understand the contents of the bill of lading, and who is to suffer if the original contract is to be considered as overturned and destroyed. After the plaintiff's wool was loaded upon and within the defendant's cars, and the cars locked, it was hardly the proper time for the defendant to attempt to change the original contract."

In Strohn v. Railway Co., 21 Wis. 562, 94 Am. Dec. 564, it was held that a prior contract for the carriage of goods was not affected by a bill of lading subsequently delivered and received by the shipper without objection, when his attention was not called to the difference between the prior contract and the terms of the bill of lading. In the discussion of the question, Dixon, C. J., who announced the opinion of the court, said:

"Nor do I think that the party is bound to examine the paper at once, and know the contents, and return it to the company, or give immediate notice of his dissent, at the peril of being held concluded on the ground of acquiescence or neglect. Having previously entered into a special verbal agreement, he may rightfully assume, in the absence of notice to that effect, that it is embodied in the paper or receipt, or at least, that the receipt contains nothing contrary to it. It is in the nature of a direct fraud or cheat for the company or its agents, after having entered into a verbal agreement, thus wrongfully to insert a contract of an entirely different character, and present it to the party without directing his attention expressly to it and procuring his assent."

The following cases may also be cited as sustaining the general proposition that, when goods have been received by a carrier under a prior contract, such contract is not merged in a bill of lading subsequently issued, unless it is shown that the shipper assented to the terms contained therein. Gaines v. Insurance Co., 28 Ohio St. 418; Park v. Preston, 108 N. Y. 434, 15 N. E. 705; King v. Woodbridge, 34 Vt. 565.

It is urged by the proctor for petitioners that a different rule was asserted in the case of The Caledonia (C. C.) 43 Fed. 681, and by the supreme court in affirming the judgment in that case (157 U. S. 139, 15 Sup. Ct. 537, 39 L. Ed. 644). I do not so understand the opinions referred to. The only discussion of the question was by Mr. Justice Gray in the opinion delivered by him in deciding the case in the circuit court, and reported in 43 Fed. 681. The court did hold that, upon the particular facts before it, a prior written memorandum was merged in a subsequent bill of lading, but the rule was recognized that a prior contract for the carriage of goods could not be changed, by a subsequent bill of lading, without the assent of the shipper. This is the language of the learned justice upon this point:

"A contract for the carriage of goods by sea may doubtless exist without a bill of lading, and, when the parties have made such a contract, the shipowner cannot, without the shipper's consent, vary its terms by inserting new provisions in a bill of lading, and the shipper may decline to assent to the modifications, and insist upon his right to have the goods carried under the original contract. Jones v. Hough, 5 Exch. Div. 115; Crooks v. Allan, 5 Q. B. Div. 38, 40, 41; Lord Bramwell in Sewell v. Burdick, 10 App. Cas. 79, 105. But the bill of lading is often given by the shipowner, and accepted by the shipper, as expressing the terms of the agreement between them, and when this is the case both parties are bound by its provisions."

A careful reading of the opinion will show that the finding of the court in that case, that the bill of lading was the contract under which the carrier undertook to transport the shipper's cattle, was based upon the fact that the prior memorandum was considered incomplete because it did not exempt the carrier from liability for loss occasioned by perils of the sea, and upon the further facts that "the shipper not only, without objection, accepted and forwarded to the consignees their bill of lading, but in the usual course of business between the parties, both before and after this shipment, he accepted similar bills of lading under like circumstances." Neither of these facts appear in the case now under consideration.

3. The necessary conclusion from what has been said is that Rankin is entitled to recover damages for breach of the contract under which his goods were delivered to petitioners for carriage. The freight having been prepaid, the measure of damage is the market value of the goods lost at the place of destination, at the date when they should have been delivered, with interest from that time. Spring v. Haskell, 4 Allen, 112; The Joshua Barker, 1 Abb. Adm. 215, Fed. Cas. No. 7,547; The Boston, 1 Low. 464, Fed. Cas. No. 1,671. "The owner is entitled to have the equivalent of the goods at the place of destination, in the condition in which the carrier undertook to deliver them, less the charges for transportation and delivery." 3 Suth. Dam. 237; 1 Pars. Shipp. & Adm. 271; Arthur v. The Cassius, 2 Story, 81, Fed. Cas. No. 564. In the absence of evidence of the market value of the goods at the place of destination, it will be presumed they would have been worth as much there as at the place of shipment, with cost of carriage added. 3 Suth. Dam. 247. There was no breach of the contract for the transportation of Rankin, and he is not entitled to recover the passage money paid by him.

4. The claim of O'Connor: The goods of this claimant were shipped under the bill of lading set out in the petition, and which contained the clause above quoted, requiring any claim for loss of property shipped thereunder to be presented to the carrier within 10 days from the date of the shipper's receiving notice of the loss, as a condition of the liability of petitioners for the resulting damage. A common carrier has the undoubted right to provide in its contract of carriage that notice of claim for damages on account of loss shall be given by the shipper within a reasonable time, as a condition of its liability for such damage. Express Co. v. Caldwell, 21 Wall. 264, 22 L. Ed. 556; The Queen of the Pacific (decided Jan. 7, 1901) 21 Sup. Ct. 278, 45 L. Ed. ——; Lewis v. Railway Co.,

5 Hurl. & N. 867; Jennings v. Railway Co., 127 N. Y. 438, 28 N. E. 394. The time specified in the bill of lading for the giving of this notice is not unreasonable. The claimant was not thereby required to give such notice at the office of petitioners in San Francisco, and notice given to their agent, the master of the steamer having the barge in tow, would have been sufficient. It is undisputed that O'Connor did not give to petitioners the required notice, within the time specified in the bill of lading. This being so, he is not entitled to recover in this proceeding.

5. There is still another ground upon which the claim of O'Connor must be disallowed. The bill of lading under which his goods were carried contained the following provision:

"It is understood that the carrier's vessels are warranted seaworthy only so far as due care in the appointment or selection of agents, superintendents, pilots, masters, officers, engineers, and crew can secure it; and the carrier shall not be liable for loss, detention, or damage arising, directly or indirectly, from latent defects in boilers, machinery, or any part of the vessel, provided reasonable measures have been taken to secure efficiency."

This, in effect, limited the warranty of the seaworthiness of the vessels upon which the goods were to be transported to reasonable efforts upon the part of petitioners to make them seaworthy in the particulars named. The evidence shows that the barge was put together at Kotzebue Sound by a ship carpenter employed by the petitioners for that purpose, the lumber therefor having been previously cut, in San Francisco, into pieces of the length and thickness required for its construction, in accordance with specifications furnished by an experienced shipbuilder. Although the barge as constructed was not seaworthy in fact, still, in my opinion, the petitioners, in the matter of its building, and in the selection of the ship carpenter who put it together, took reasonable precaution to secure a seaworthy barge, and also observed due care in the appointment of the master, engineer, and crew of the Arctic Bird. Having done this, the petitioners complied with their contract, and are not responsible for the failure to secure a seaworthy barge.

6. The claim of Snow: The goods of the claimant were shipped under a bill of lading containing the same warranty in relation to the seaworthiness of the vessels upon which they were to be carried as is found in the bill of lading delivered to O'Connor, and, as there was no breach of this warranty upon the part of the petitioners, the claimant is not entitled to recover.

A decree will be entered disallowing the claims of O'Connor and Snow, and the cause will be referred to Commissioner Morse, to ascertain and report the amount of damage sustained by Rankin.