## Case No. 3,069.

### The COMPTA.

### [4 Sawy. 375.][1]

### District Court, D. California. Oct. 11, 1877.

#### "Perils of the Seas"—Carrier's Defense.

Where the damage to goods shipped under a bill of lading is shown to have been occasioned by leaks in the ship's decks, and the defense relied on is "perils of the seas," it is not enough for the carrier to prove the occurrence of sea perils which might have caused the leaks; he must show that they did. This he may do by showing that the peril was of such a character that injury to the vessel was its natural and necessary consequence; or he may prove that the vessel was in fact injured, by the testimony of those who observed the effect of the peril at the time of its occurrence; or he may prove its effect by showing her condition on her arrival; or he may exclude any other hypotheses, by satisfactory proofs that her decks were sound, stanch and well caulked at the commencement of the voyage: *Held*, under the proofs in this case, that the decks were unseaworthy.

In admiralty.

George B. Merrill, for libellants.

C. Temple Emmet, for claimants.

HOFFMAN, District Judge. This action is brought to recover damages for injuries to goods shipped on board the above vessel and consigned to libellants under various bills of lading, which are appended to the bill. At the hearing, the shipment of the goods and their delivery in a damaged condition were admitted. It was also admitted that the damage was by sea-water. The burden of proof was thus cast upon the carrier to show that the damage was occasioned by one of those causes from the effects of which he is exempted by the terms of the bill of lading or by the general rules of law.

The defense set up in the answer is "perils of the sea." It is contended that the vessel, during the voyage, encountered such violent gales and heavy seas "as to strain and damage her, thereby causing her decks to leak and admit water to the cargo." In proof of these allegations, the claimants produced the log-book and the protest of the master, supported by the suppletory oaths of the latter and the two mates. The log-book shows that the ship experienced weather of very considerable severity. On the twenty-eighth of October the log-book notes "terrific squalls of wind and rain, high confused sea, flooding the decks at times." On the twenty-seventh of November it notes: "Eight a. m., frightful sea with terrific squalls, with hail and rain, flooding decks fore and aft; noon, squalls taking off, but still a heavy sea." The decks appear to have been very frequently flooded, and "high, confused seas, heavy seas, heavy swells," are constantly mentioned. On four occasions the record notes "heavy head-sea, causing ship to pitch hard." "Heavy head-sea, ship pitching heav-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

ily." "Heavy head-sea, causing ship to go bows under." "Ship driving heavily." But it is to be observed that the log-book nowhere records any serious disaster to the ship, unless the springing of the head of the mizzen-top-gallant mast be so considered. Some sails were split on one or two occasions, and some halliards and sheets were parted, but the hull of the ship seems to have sustained no damage whatever. She is once or twice mentioned as "rolling heavily," but throughout the voyage she is not once spoken of as "straining" or "laboring" in the seas. On the thirteenth of December, when the log-book states that a heavy head-sea caused the "ship to go bows under, filling decks fore and aft," she appears to have been under top-gallant sails, and the entry contains the note: "Ship behaving well." On the third day, when she is mentioned as driving heavily, she seems to have been under all sail. These facts tend to corroborate the suggestion of some of the experts, that much of the flooding of the decks may have been caused by her having been driven against head seas, under too much canvas. The squalls she experienced, though frequent and severe, appear to have been of short duration. Only twice during the voyage does she seem to have encountered what the log-book mentions as a "strong gale." But the most significant circumstance is the fact that the ship was compelled by stress of weather to heave to, only twice during the entire voyage, and then only for a few hours. This fact seems of itself sufficient to show that the voyage could not have been of extraordinary severity.

From the foregoing it may, I think, reasonably be concluded that the weather experienced by the vessel was such as might, possibly, have produced, on a stanch and seaworthy ship, the effects attributed to it by the claimants. But that it was not of such unusual and extreme severity as to justify the assumption, without further evidence, that it caused the leaks which occasioned the damage. The carrier, to make good his defense, is bound to show that the damage arose from a sea peril. It is not enough for him to show that it might have arisen from that cause. He must prove that it did. This proof can be afforded either by showing a sea peril of such a character that injury to the vessel, however stanch and seaworthy, would be its natural and necessary consequence; or, by the direct testimony of those who observed its effect upon the ship; or, by proving her condition on her arrival; or, he may exclude every other hypothesis of causation, by satisfactory proof that she was tight, stanch and seaworthy at the commencement of the voyage. The proofs fail to show sea perils of the kind first above referred to. The log-book shows weather of some severity, but not greater than is usually encountered on similar voyages; no proof of the second kind above-

mentioned is offered. No one, during the voyage, observed that the ship was straining, that her butts and seams were opening, that her oakum was being "spewed out" under stress of weather, or that from any cause her decks were leaking and water gaining access to her cargo.

The master and mates testify very positively that when the vessel left Calcutta, her decks were tight, and neither "leaky, decayed, worn or perforated." The testimony of the numerous experts who made a critical examination of her condition after her arrival at this port will hereafter be noticed. But with reference to the master, it may at this point be observed that his testimony must be received with much reserve. He swears that the decks were not repaired at Calcutta; that he "never saw any rotten places in her decks, nor any place where her deck might have leaked during her last voyage; that he couldn't find any leaks about the decks, only about the bitts forward; and that no caulking was done while it rained." On all these points he is contradicted by the claimants' own witnesses. The mate testifies that he repaired the decks at Calcutta, by the master's orders. He cut out rotten pieces in her decks, and replaced them by graving pieces. He is unable to say in how many places these repairs were made. It is admitted on all sides that the decks leaked, and that the cargo was thereby damaged. The disputed point is whether the leaks were caused by the vessel's straining in heavy weather or by their being rotten, worn and badly caulked. The master's virtual denial of the existence of any leaks is inconsistent with the admitted facts of the case. It is established beyond controversy, and is not seriously disputed by the claimants, that the decks were decayed in many places. The contention is that the decay did not extend far enough into the wood to impair the seaworthiness of the decks. And, finally, the log-book seems to show that between August 19 and August 26, the period during which the caulking was done, it was almost constantly raining. The testimony on which the decision of the case must finally turn, is that given by the experts who examined the vessel at this port, and after the discharge of the cargo, for the purpose of ascertaining her condition and the cause of the damage.

On the part of the respondents, five witnesses of great respectability (three of them marine surveyors and two master shipwrights) testify that beneath the graving pieces in the vessel's decks there were, at least three inches, of sound wood; that in the between-decks, which had been whitewashed, there were several stained spots which they attributed "to small leaks through the decks, which the whitewash rendered more conspicuous than they would otherwise have been;" that the bolts had been driven down in several places to admit of the graving pieces being set in the

deck, "to none of which could we trace a leak caused thereby. We consider the decks seaworthy and a proper protection to cargo stowed underneath."

The above is the substance of the report made by these witnesses. Their testimony, as delivered on the stand, is on some points curiously at variance with their report. By the report we learn, or are led to infer, that the decks, though partially decayed, were still sound and seaworthy, the leaks few and slight, and that in their then condition, the decks would afford a sufficient protection to cargo. It is somewhat significant that on the stand they do not venture to make this latter assertion. Two of them add the important qualification, "provided they were well caulked." And none of them pretends that, without being well caulked, the decks would be seaworthy. As the report professes to give the condition of the decks when inspected, and not the condition they would be in, after their defects had been remedied, it is not easy to reconcile this inconsistency. Still less am I able to reconcile their statement that they merely found several stained spots, made conspicuous by whitewash, which they attributed to "small leaks through the deck," with the inexorable and undisputed fact that the cargo was greatly damaged, to what extent did not appear at the hearing, but the libel avers to the amount of $35,000, and the answer alleges that the damage was caused by stress of weather, "by reason of which the vessel was strained and damaged and made to leak in her decks and elsewhere."

In the report no mention whatever is made of any indications of straining or other damage to the vessel. If any such were observed, they were, like the necessity of re-caulking, silently ignored. On the stand, several of these experts profess to have discovered signs of straining. They appear to have, probably unconsciously, abandoned the position adopted in the report that the decks, when they inspected them, were tight and seaworthy, and accepted the position assumed by the claimants, viz.: that the decks were not tight, that the oakum had been "spewed out" of the seams, and the cargo had been damaged by the leakage, but that the decks had been brought into this condition by the straining of the ship caused by stress of weather.

The indications of straining, which they profess to have discovered, are slight and inconclusive. Some of them admit that the condition of the decks might as well be referred to defective caulking as to the straining of the vessel, and they almost seem to have concluded that because she leaked she must have strained. To rebut the testimony of these experts, the libellants produce a report signed by ten of the best known and most experienced ship-masters and shipwrights in the port, of the result of their inspection of the vessel. The report states

that they "find no evidence of the vessel being any way strained by stress of weather. The main deck we find to be leaky in many places, owing partly to the decay of her timber, and partly to graving pieces having been put in, under which water has lodged and leaked down alongside of the deck fastenings. Also that the deck has been repaired in a very inefficient manner with old material, and is, in our opinion, unfit for a vessel carrying dry and perishable cargo. We also find evidence of leakage in, or close to the scuppers, but owing to their being removed before our surveys, we had no opportunity of finding out the real cause of the leakage."

All these witnesses, except Captain Thomas, who was not called, reiterate and confirm on the stand the statements contained in their report. Wm. Dickie, in particular, who is a shipwright of much experience in the construction of iron ships, testifies in the most positive manner that it would be impossible for an iron ship to strain without showing it in her rivets; and that the rivets of the Compta were perfectly tight and firm. All the witnesses testify to a thorough examination of the vessel for the express purpose of ascertaining whether she had strained, and of finding out the real cause of the damage. They examined rivets, butts, seams, waterways and the side and deck beams, and every place where evidence of straining is to be sought for. They all concur in the result of their examination. They also found many evidences of rottenness in the decks, and they state not only that the deck bolts were driven down to admit of graving pieces being inserted above them, as mentioned by the respondents' experts, but they add, which those experts omit to mention, that the nuts had not been screwed up to the beams, thereby rendering the bolts loose and ineffective. To this cause they distinctly trace a portion of the leaks.

They further testify that the deck had been repaired with old and decayed timber, and that the caulking had been unskillfully and inefficiently performed. In illustration of this last defect, they state that the oakum in some places hung down from the deck, having been driven through the seams; that in some places they could insert the blade of a knife into the seams, and pass it from beam to beam, without encountering any caulking whatever; and they produce in court a piece of ratline or small cordage taken from a seam which was too wide to be filled with the usual and proper material employed in caulking. To these defects, the witnesses referred to attribute the damage sustained by the cargo.

In presence of this testimony it becomes immaterial to discuss the disputed question, whether it is possible for an iron vessel to strain to such a degree as to open her seams, "spew out" the oakum and admit water to the cargo, and afterward return so completely to her previous condition as to show no traces of the occurrence. The question is, moreover, immaterial to this discussion. All the evidence shows that the decks were unseaworthy when the vessel was surveyed. The libellants' witnesses so state in express terms, and the respondents' witnesses impliedly admit it when they state that the decks would be seaworthy, "provided they were well recaulked." The only question in the case therefore is, to what cause is this unseaworthiness to be ascribed. I think that the libellants have shown by a clear preponderance of evidence that it is to be attributed to defective material and caulking of the decks, and not to perils of the seas. Some evidence was given tending to show that the wrappings of the injured bales were insufficient, and that if they had been covered with tarpaulin the damage would have been lessened or avoided. But the mode of packing was apparent, and could have been objected to by the carrier when the goods were offered. It is, moreover, the usual and customary mode in which such goods are packed, and it would seem the invariable mode adopted in Calcutta, from whence the greater part of the supplies of bagging are imported into this city.

An order will be entered referring the cause to a commissioner to ascertain and report the damages.

[NOTE. The cause was subsequently heard on exceptions to the commissioners' report. Case No. 3,070, following.]