THE WARREN.

In re ULTICAN et ux.
No. 7200.

District Court, W. D. Washington, S. D.
Feb. 28, 1930.

702

inches high. While the proportions may not be exact, it was shaped somewhat as follows:

Theodore B. Bruener, of Aberdeen, Wash., for petitioners.

Elmer S. Smith, of Centralia, Wash., and J. O. Davies, of Seattle, Wash., for respondent.

CUSHMAN, District Judge (after stating the facts as above).

Two main grounds for recovery are pressed, one that the Warren was shown to be unseaworthy at the time of the charter, the other, that her loss, being unexplained, there arises a presumption that she was unseaworthy. These will be considered in the order stated.

On the 26th day of March, 1927, petitioners chartered the Warren to the Independent Gravel Company of Seattle, Wash., the charter being for one year, she then lying in the waters of Grays Harbor, to be delivered to charterers in the waters of Puget Sound, it being understood that she was to be used in the sand and gravel business of charterers in the waters of Puget Sound and British Columbia, the charterers to fully man the Warren during the life of the charter and to keep her in good seaworthy condition and at the termination of the charter to redeliver her in as good condition and repair as at the time of charter, reasonable wear and tear excepted.

The Warren was built by the Union Iron Works in 1909, as the Lieutenant J. A. Gurney, for the service of the United States Army Quartermaster. When launched she came under her own power to Puget Sound where she was used about the Sound forts until 1923 when petitioners purchased her. Under her own steam she was taken to Grays Harbor and "converted" into a tugboat. She was thereafter used out of and about that harbor in towing service until March, 1927. Her registered length, breadth and depth were 58x13.1x6.6. She was 65 feet over all. She was at the time of her loss equipped with 170 horse power Diesel engine; her freeboard was 5 or 6 feet forward and 2 or 2½ feet aft, with a 57-inch propeller, 2½ feet under water. Her towing bit was 36 feet forward from the stern.

and placed just to the rear of the house and 23 feet forward from the stern.

The evidence is that her frame was of oak; her planking of Port Orchard cedar; that the latter timber will not rot; that she was copper fastened and copper bolted, with three steel bulkheads.

There is a dispute in the evidence as to the lifeboat, whether of steel or wood, as to its dimensions, seat or seats, and oars. The preponderance of the evidence is that it was of steel, 15 or 16 feet long with two seats for rowers. A deck hand employed on her as late as February, 1927, testified that she had a full complement of oars and locks and "one each extra." Petitioner Richard Ultican testified that he thought it was certified for seven men. There was further testimony that the cubic contents was "carved" in the bow and stern as 58 cubic feet. There was testimony that 58 cubic feet capacity in a lifeboat was sufficient for 5.8 men. The Warren, not being over 65 feet in length, was not subject to regulation under title 46, chapter 16, section 511 (USCA). However, under the regulations of the Department of Commerce, Steamboat Inspection Service, of May 4, 1929, for bays, sounds and lakes other than the Great Lakes, on page 66, paragraph 20, such capacity would be sufficient for five men. So would it be under the Ocean and Coastwise Rules of May 4, 1929, pages 73 and 74.

The evidence is that the lifeboat did not leak and was equipped with two or three airtight compartments. The impression gathered from this evidence is that the number was three, one at each end of the boat and one near the middle. She had about ten life-preservers and two life-rings, the latter kept in the pilot house.

In 1925 the rim, or horseshoe, was found to be soft and was replaced. For lack of ventilation in this part (the stern) of the

boat, it is shown that this is the first place to be affected by dry rot. There was no other evidence of decay save inferential from that concerning caulking, presently to be considered.

A change was made in 1924 when a Diesel engine weighing in the neighborhood of seven tons replaced the one for steam. The testimony is that the weight of a steam "plant" would be about the same. It has been argued that the base for the Diesel engine lessened the capacity of the bilge so that the danger was increased when an unusual amount of water was in it. The evidence shows that on practically all tugboats Diesel engines are now used and nothing unusual has been shown as to the installation of this engine or that the bilge capacity was inadequate.

It has been contended that the companionway forward was open, so that if she shipped water it would enter the forecastle. The preponderance of the evidence shows that there was a coaming around the companionway with a sliding hatch cover on a slope, and in addition a canopy. There is no evidence that water shipped, or otherwise ever entered through this companionway. No ports are shown by the photographs of the Warren. The undisputed evidence is that such companionway was necessary for ventilation in the forecastle.

Before bringing the boat from Grays Harbor to Seattle for delivery to the charterers, she was overhauled, which included carpenter work, painting, and caulking. There is testimony that on this trip there was water in her bilge a foot over the floor plates, and that being unable to pump it out she put in behind Destruction Island to do so. There is a dispute in the evidence concerning this. A brother of respondent, named Graves, testified that he worked as assistant engineer on this trip and that the strainer was blocked by caulking driven out from the seams, meaning that the fibre used in caulking the seams between the planks was driven out, which caulking was in the water to be pumped. If this were true no question is made, but it would show an unseaworthy condition. The preponderance of the evidence, however, is that the strainer was clogged by shavings and chips from the recent carpenter work done on the boat while at Grays Harbor. In this recent overhauling new packing had been put in the stuffing box. It appears from the evidence that for a time after such a replacement the vessel will leak through the stuffing box; that it should be tightened gradually, otherwise the packing

will be burned out. It appears that this was the source of the water in the bilge. It was necessary to stop behind Destruction Island to permit the man at the wheel to go below and tighten the stuffing box and fix the pump with an auxiliary rig. This was occasioned because the chief engineer, Tucker, the deceased, was too sick to do either, the man at the wheel testified. He also testified that the above-mentioned witness was seasick in bed. He is corroborated as to the latter being seasick. The trip from Grays Harbor to Seattle was made in thirty-three hours.

There has been testimony that a fourth pump of $2\frac{1}{2}$ or 3 inches, referred to as a siphon pump, capable of pumping 800 to 1,000 gallons a minute was installed during the operation of the boat by charterer about May first, from which it is argued that the Warren was then in a leaky condition. All the pumps were capable of being used for pumping the bilge. The preponderance of the evidence is that this latter pump was installed for the purpose of pumping out the towed scows, as the other pumps on board were not capable of pumping out the scows "in short order." One of the pumps was a hand pump on the deck worked with two or three men on the handles.

On May 23, 1927, the Warren had made seventeen round trips with scows between Seattle and Victoria—empty from Seattle to Victoria and loaded upon return. There is no evidence of any trouble having been experienced during this time on account of the Warren not being seaworthy, with the exception of that of the witness Graves, or that any complaint had been made by the deceased or any other on such account. The master of the Warren was an experienced one. With a crew of five men she was fully manned.

It appears that the officers of the charterer directed that the boat remain for a time at Seattle at the end of the last of these trips. The crew, it is testified, on account of the Queen's Birthday celebration in Victoria, wished to lay over at Victoria rather than at Seattle, certain of them requested this and the charterer consented.

On the afternoon of May 23, 1927, the Warren left Ballard for Victoria with the scow Crosby No. 1 in tow. She was three quarters of a mile ahead of the Martha Foss, also leaving Ballard for Friday Harbor with two scows in tow. From this time until the Warren went down the only witnesses who saw her were those upon the Martha Foss. From their testimony it appears that the

Warren, shortly after leaving Ballard (at the red buoy), let out her towline, which, it would appear, would be over 600 feet. At 11:45 p. m. the Warren was still three-quarters of a mile ahead of the Martha Foss and was then off Marrowstone Point a mile and a half and south of Admiralty Head. The Warren then altered her course for Wilson Point, passed half a mile ahead of the Martha Foss and both saluted. There was then a breeze, but the sea was not rough. The Martha Foss proceeded off Partridge Point on a course for Smith Island. As she proceeded it got rough. The Martha Foss got to Smith Island about 2:30 a. m. May 24th. The Warren had passed Port Townsend, Wilson, and Middle Points and appeared to be running for the shelter of Protection Island. The lights of the Warren disappeared at 2:25 a. m., about forty-five minutes after the Martha Foss had passed Partridge Point. The Warren was then eleven to fourteen miles from the Martha Foss. The wind was from the northwest and against the tide. The Martha Foss, which was 131x16x7 forward and 11 aft, had, after last seeing the Warren five feet of water in the after part of her engine room. She was taking, it was testified, two feet of solid water over her bow and when the scows in tow would dive it would stop the boat. The witness, Carnahan, who, on the night of the 23d, with his boat the Hornet of the Washington Tug and Barge Company, lay at Ft. Casey, testified that there was "quite a sea running." The engineer of the Martha Foss describes the wind as a "gale." The recorded wind velocities at Seattle and Port Angeles did not exceed twenty or twenty-two miles. It may be that with a northwest wind out of the Gulf of Georgia the wind velocity would be greater at the place in question than at either Seattle or Port Angeles. While such a sea as that described would not be expected at such wind velocities, yet the court cannot question the truthfulness of the testimony above outlined.

The scow Crosby No. 1, was picked up by the Hornet between 6 and 7 o'clock in the morning on May 24th between Wilson and Hudson Points. Two lanterns on her were still burning with 200 or 250 feet of towline hanging to her. The evidence does not disclose how the towline was fastened to the scow.

It has been testified that this line appeared to have been cut. It was not produced in court. It was a seven or eight inch Manilla line. Carnahan of the Hornet testified that the cut through it was a clean cut and that it had missed half a strand. Petitioner Richard Ultican testified that it appeared to have been cut with a sharp piece of metal like a propeller blade or an axe, but that when a line is cut with an axe it is generally cut more than once. It is also testified that it was not cut straight through.

From the Warren nothing was found except a food box, a coat (mackinaw), a life-preserver, and possibly a body. The body was found in a fish trap near Middle Point, about a mile from where the Warren was last seen, where she was "supposed to founder." It has not been clearly proven that the body was that of any of the crew. There was no life-preserver on it. A life-preserver, stenciled Warren, was found on the beach two miles southwest of Wilson Point, the only evidence of its condition being that it was in "perfect shape." An oar was picked up but it was not shown to belong to the Warren.

The deceased, Tucker, chief engineer, had been on the Warren ten months or a year at the time of the charter. It is testified that he was planning to move his family to Seattle.

It has been testified, without specific contradiction, that the Warren was of the same general construction as other towboats but with more freeboard and "may be" a foot narrower than ordinary tugboats.

There is testimony that in 1925 this boat made a rough trip out of the Straits of Juan de Fuca towing a barge to Grays Harbor, the witness testifying that it was a bad trip from Clallam Bay out, heavy easterly wind and strong tide. There is other testimony concerning her use in towing over the Grays Harbor bar in rough weather, it being testified that on one particularly rough trip she was on the bar with a barge for five hours; that the hawser broke "all of fifteen times" and that "nothing would hold."

There has been no testimony of her having capsized or of her having been threatened with such a disaster at any time prior to her loss, but nearly all of the testimony is that she behaved well as a towboat. An attempt was made to show that she had a reputation of being "cranky" but no witness so testified. A witness, one for the petitioner, who had been on the Warren eight months in 1926 and 1927, stated "she was cranky on the tow"; that with a pull on the quarter she would list.

The most serious dispute in the evidence touching the matter of seaworthiness is as to her having, at the time of the charter and loss, a hole in her bow. The testimony for the administratrix on this point, in sub-

stance, is as follows: Her brother, the witness Graves, testifies that she had a hole in her bow on the starboard side, six feet from the bow, half way between the water line and guard; that it was a foot long; that it looked like a scow had swung around and its corner hit the bow; that on her trip from Grays Harbor to Seattle preceding the delivery to charterer she got into Seattle at midnight; that the next day, as the court recalls the testimony, petitioner Richard Ultican asked Chief Engineer Tucker "what made that hole in the bow?" Petitioner Richard Ultican denies having said anything of this kind and states that the first he heard of the hole in the bow was at the trial. Graves testifies that when it was rough, before they could get the scow pumped, they had to use all of the pumps; that they used the scow pump in rough weather; that he had never seen any water in the forecastle at any time.

Another witness, a man having sea experience on Puget Sound, Bering Sea, and the Pacific, whose son was lost on the Warren, testified that he visited the boat three times while she was at Seattle after the charter; that on the first visit he went over the boat pretty thoroughly; that he noticed the hole in the bow; that it was about eighteen inches long; that it was stove in possibly an inch and a half; that it didn't show on the inside. Included in his sea experience was eighteen months on Puget Sound boats, a considerable portion of which time he was on a boat or boats towing around Seattle, Tacoma, and Bellingham; that in towing to Bellingham the trips were made to the west of Whidbey Island which would be over the course taken by the Martha Foss on the night of May 23d; that he felt no concern about the hole in the Warren's bow. The wife and son of this witness also testified that they saw this hole, the latter testifying it was not repaired.

A tugboat captain testified he saw the Warren eight or ten times after she came to Seattle; that he saw such a hole; that it was a foot long and about six inches wide; that it looked like the corner of a scow had jammed it; that it would take some water there; if pumps were in good condition it wouldn't sink her "if pumps were working at all"; that it would not take her long to fill up if her pumps were not working. It was shown that this witness had written a letter before the trial to petitioner Richard Ultican saying: "If I had $75 to get out of reach of court before I am called I don't think they have a chance to stick you. I shall be in Tacoma Gen Del for a few days. If I can help

you write me there. My family have gone to Cal for summer." This witness was unable to explain what he meant by the foregoing. He admitted that he had been convicted twice, once of larceny and once of forgery.

It is significant that in the enumeration, in the answer and claim for damages of the administratrix, of the defects asserted as rendering the Warren unseaworthy, no mention is made of this hole.

For the petitioners it was testified by the witness, who fixed the stuffing box and rigged the auxiliary to the pump at Destruction Island, that he looked the boat over before leaving on the trip from Grays Harbor to Seattle and that there was no hole in her; that she struck nothing on her way "up"; that he knows of no hole in her at Seattle. This witness returned to Aberdeen after delivery of the boat at Seattle.

Carnahan of the Hornet, who pumped out the scow for the Warren after charter and before the siphon pump was installed, testified there then was no hole in the bow of the Warren.

The man who, at Hoquiam, supervised the work of overhauling the Warren before delivery to the charterer, which work included scraping and painting the hull, testifies that there was then no hole in the bow. He is corroborated by the manager of the Bar Pilots' Association of Grays Harbor who says he was on her one or two days before she left, looking her over, which examination, he says, lasted an hour; that he saw no hole in her bow; that he is certain there was none there. The nature of his duties as such manager is not clearly shown, but he stated he always caused equipment to comply with the requirements of underwriters.

Captain Maloney, marine surveyor, long familiar with the boat, having surveyed her once in 1923 and in 1924, made what he terms a general survey a month or so before she was lost. He knew of her proposed run and examined her to see if she was fit for it; to see if she was fit for insurance, and he found her in good seaworthy condition; that if there had been a hole in her bow he thinks he would have seen it.

The man, who, for the charterer, negotiated the charter, examined her at Grays Harbor before chartering and accepted her for the charterer upon her arrival at Seattle, says there was then no hole in her bow.

The preponderance of the evidence is that no such hole as that described existed.

Ordinarily the testimony of witnesses

who testify positively to seeing a thing is of greater weight than negative testimony, but the conduct of the witnesses is inconsistent with the existence of such a hole as that described. The testimony of Carnahan is particularly persuasive as he had no interest in the matter about which he was testifying. The repairing by "graving" such a plank above the water line would have been a simple and inexpensive matter and it is unreasonable to conclude that the charterer would have accepted the boat with such a hole in her bow or that Captain Maloney would have found her an insurable risk.

A discussion of the cause of the loss of this boat may not be necessary. It will be noted that the Warren kept ahead of the Martha Foss up to the time she crossed the latter's bow and set her course for Point Wilson; that on this course she crossed the mouth of Port Townsend. It is therefore reasonable to conclude that she was not in trouble up until the time she passed Point Wilson. On this course the wind would be at right angles to her course. The tendency would be to swing the scow to her port quarter. It will be noted that while the distance to Protection Island (which she did not reach) was less than half of that traveled by the Martha Foss to Smith Island, it is obvious therefore that she was for some reason traveling much slower than the Martha Foss which was running directly into the wind. There are strong tide rips around Point Wilson.

The testimony is that this boat was built for speed. Her freeboard aft was from two feet to two and one half feet which would be greater than that of the ordinary tugboat. It has already been stated that she was a foot narrower than the ordinary tugboat. The height of her towing bit has been stated.

There was testimony that whistles were heard near the location where she must have foundered on the night in question. There was no testimony as to what these whistles were. It was suggested by petitioner Richard Ultican that with the swing of her tow to port a meeting vessel might have passed between the tow and the Warren cutting the tow line and capsizing the Warren. This theory finds some support in the fact that whatever the catastrophe was, it must have occurred suddenly, as indicated by the little that was found from the Warren and that her boat was evidently never launched, but the description of the cut towline makes it appear to have been done with an axe rather than by a propellor or the prow of another boat.

No testimony has been given as to any defect in the engine. It is testified that at one time the Warren was put in service on Grays Harbor bar, replacing a boat that had turned over on the bar. There is no evidence that more than five men were ever required or employed on the Warren.

The greater number of expert witnesses have testified that they considered her suitable for the run in which she was engaged.

It appears reasonable to conclude that the Warren was capsized by the pull of her tow on her starboard quarter but it would be speculating "too curiously" to find that her line was cut by a passing boat. It appears more likely that her towline broke one or more times and that in maneuvering or attempting to proceed with a shortened towline she was capsized.

The cause of the loss of the Warren being unknown and a mystery of the sea, there remains for consideration the question of whether this fact creates a presumption that she was unseaworthy. None of the cases cited relate to the death or injury of a seaman. With the exception of Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012, they are, in the main, suits between shipper and carrier.

The following cases: Compagnie Maritime Francaise v. Meyer et al. (C. C. A.) 248 F. 881; The Queen (D. C.) 78 F. 155, affirmed under title of Pacific Coast S. S. Co. v. Bancroft-Whitney Co. et al. (C. C. A.) 94 F. 180; The Arctic Bird (D. C.) 109 F. 167, are cases in this circuit and concern bills of lading, shipping receipts, or contracts for the carriage of goods to a port they did not reach or reached in a damaged condition. In such cases the burden is upon the owner or charterer to prove the cause of loss was a peril of the sea and not unseaworthiness, because the owner or charterer is seeking to excuse or explain nondelivery of goods, the carriage of which he undertakes, by showing that the occasion of failure was an excepted peril.

In Pacific Coast S. S. Co. v. Bancroft-Whitney Co. et al. (C. C. A.) 94 F. 180, at page 195 it is said:

"In a proceeding of this character, and under the facts established in this case, the following principles of law are well settled:

"(1) That common carriers by water, like common carriers by land, are in the nature of insurers, and are liable for every loss or damage, however occasioned, unless it happens from the act of God or the public enemy, or by the act of the shipper, or from some

other cause or accident expressly excepted in the bill of lading. The Niagara v. Cordes, 21 How. 7, 22, 26 [16 L. Ed. 41]. In Hall v. Railway Co., 13 Wall. 367, 372 [20 L. Ed. 594], the court said:

"'When a loss occurs, unless caused by the act of God or of a public enemy, he is always in fault. The law raises against him a conclusive presumption of misconduct or breach of duty in relation to every loss not caused by excepted perils. Even if innocent in fact, he has consented by his contract to be dealt with as if he were not so.'

"(2) That where merchandise is shipped, and the usual bill of lading given, promising to deliver the same in good order, the dangers of the sea excepted, and they are found to be damaged, the onus probandi is upon the owner of the vessel to show that the injury was occasioned by one of the excepted causes. Rich v. Lambert, 12 How. 347, 357 [13 L. Ed. 1017]; Nelson v. Woodruff, 1 Black, 156, 169 [17 L. Ed. 97]; The Majestic, 166 U. S. 375, 386, 17 S. Ct. 597 [41 L. Ed. 1039], and authorities there cited; The Lydian Monarch [D. C.] 23 F. 298; The Mascotte, 2 C. C. A. 399, 51 F. 605; The Compta, 4 Sawy. 375, 377, Fed. Cas. No. 3,069; Hunt v. The Cleveland, 6 McLean, 76, Fed. Cas. No. 6,885; Ang. Carr. § 202; Chit. Carr. *142; Lawson, Carr. §§ 245, 247.

"(3) That, in every contract for the carriage of goods by sea, there is a warranty on the part of the shipowner that the ship is seaworthy at the time of beginning her voyage, and his undertaking to safely carry the goods cannot be discharged because the want of fitness in the steamer is the result of latent defects. The Caledonia [C. C.] 43 F. 681, 685; Work v. Leathers, 97 U. S. 379 [24 L. Ed. 1012]; The Edwin I. Morrison, 153 U. S. 199, 210, 14 S. Ct. 823 [38 L. Ed. 688]; The Caledonia, 157 U. S. 124, 130, 15 S. Ct. 537 [39 L. Ed. 644]."

While the cases of The Queen (D. C.) 78 F. 155, affirmed under the title Pacific Coast S. S. Co. v. Bancroft-Whitney Co. et al., supra, were reversed in The Queen of the Pacific, 180 U. S. 49, 21 S. Ct. 278, 45 L. Ed. 419, it was upon another question than that here involved, and the two above-cited cases were later, upon the point now discussed, approved by the Supreme Court in The Folmina, 212 U. S. 354, 363, 29 S. Ct. 363, 53 L. Ed. 546, 15 Ann. Cas. 748.

In Work v. Leathers, 97 U. S. 379, at page 380, 24 L. Ed. 1012, it was said: " * .* * If a defect without any apparent cause be developed, it is to be presumed it existed when the service began. * * *"

It was said by the Circuit Court of Appeals in this Circuit in Compagnie Maritime Francaise v. Meyer, 248 F. 881, at page 883:

"The evidence was that such weather was not unusual or unexpected in that vicinity at that season of the year. It has been held by this court and by other courts that the development of a serious leak, occurring from no mishap or accident within a short period of time from leaving port, is evidence from which it may be presumed that the vessel was not seaworthy at the time of leaving. In The Warren Adams, 74 F. 413, 20 C. C. A. 486, Judge Wallace, for the Circuit Court of Appeals for the Second Circuit, said:

" 'Where a vessel, soon after leaving port, becomes leaky, without stress of weather, or other adequate cause of injury, the presumption is that she was unsound before setting sail.' "

Another case in this circuit is Steamship Wellesley Co. v. C. A. Hooper & Co. (C. C. A.) 185 F. 733. See, also, The Jeanie (C. C. A.) 236 F. 463.

In a case which did involve the death of an employee on a barge, Oregon Round Lumber Co. v. Portland & Asiatic S. S. Co. et al. (D. C.) 162 F. 912 (second case), Judge Wolverton held, as summarized in the syllabus: "The sinking of a vessel *while being properly handled,* without undue stress of weather or other known external cause, was presumptively due to unseaworthiness." (Italics that of this court.)

In the instant case there is no evidence that the vessel, at the time of her loss, was being properly handled.

Giving due consideration to the length and character of the Warren's service as a towboat and the fact that during such service she had never capsized or been threatened with such a mishap, and with all of the credible testimony in the case negativing any substantial decay or other deterioration, the court cannot say that a presumption, because of her unexplained loss, arises that she was unseaworthy.

While she might have been better fitted for the service in which she was employed, the court cannot find but what she was reasonably suited for it, and therefore seaworthy, not only at the time of charter but at the time of her loss.

It is therefore not necessary to determine whether the deceased was, in any sense, employed by petitioners.

Petitioners are entitled to a decree exonerating them and the vessel from liability, and respondent is not entitled to recover.

The decree will be settled upon notice.