### Petition of ERLANDSEN et al.
### No. 14307.

District Court, W. D. Washington, N. D.
Aug. 24, 1943.

Bogle, Bogle & Gates, Stanley B. Long, and Edw. S. Franklin, all of Seattle, Wash., for petitioners.

Sam L. Levinson, of Seattle, Wash., for claimants.

BOWEN, District Judge.

I believe that any admiralty lawyer representing these claimants would have been justified in filing actions here on the ground of unseaworthiness, particularly after reading Judge Cushman's decision, The Warren, D.C., 40 F.2d 700, and others in this Circuit relating to the presumption which arises by reason of the unexplained destruction and loss of a vessel at sea, and particularly the loss and destruction of this vessel at sea; and where, as I indicate, there is no known explanation of it at the time of filing such suit.

■ Judge Cushman's interpretation of this Circuit's rule upon that, of course, is this Court's interpretation at one time, and it has great weight with me as the Trial Judge in this case. That rule is to the effect that the sinking of a vessel while being properly handled, without undue stress of weather or other known external cause, was presumptively due to unseaworthiness.

The Court is not convinced from the evidence here that the weather and seas prevailing at the place where the Nordic Pride was last seen in her sinking condition were of sufficient force to convincingly explain the swamping of the vessel. There was a Beaufort scale force gale of approximately 7, and there were some heavy seas; but vessels of this type commonly successfully navigate the waters along the Pacific Coast in such gales and seas.

There must have been some other force or condition, either within or without the vessel, which resulted in her waterlogged condition in which she was found before she finally sank.

There was a lot of testimony on the question whether the position in which the vessel was riding in the water in her waterlogged condition indicated that the vessel was stable or unstable, and whether or not the vessel's loss was caused by her own instability. Much of the testimony was conflicting as to the proper inference to be drawn from the slanting position of the vessel in the water (slanting from stern downward in the water); but it seems to me the evidence was overwhelmingly to the effect that, so far as one could reasonably judge from that position of the vessel, such position pointed to the fact that the vessel was stable in her sea action athwartship; and by her "sea action athwartship" I mean her reaction to the force of the seas against the side of the ship.

The principal contention made by claimants in respect to their assertion of unseaworthiness turns around the issue of instability, the claimants asserting that the vessel was unstable, and therefore unseaworthy for that reason.

The last known physical evidence as to stability of the vessel is circumstantial and consists of the conditions observed by those who saw the vessel in the water in her waterlogged condition, bow down, stern up, during the two days that she remained afloat before she finally disappeared beneath the surface of the water. Witnesses who interpret that physical and circumstantial evidence have testified to inferences properly to be drawn therefrom, and from such evidence the Court must conclude that such condition of the vessel with the surrounding circumstances of wind and seas convincingly establish the vessel's stability before she foundered and while she remained afloat.

I think there is a lot of room for contention about the purpose of concrete ballast in these fishing vessels. There is some credible evidence in this case that, depending upon the weight of machinery and equipment, the ballast bears some definite relationship to the necessary weight to be put in the hold of the vessel to more effectively control the stability of the ship.

On the other hand, and opposed to that evidence, in the Court's opinion, may be found convincing evidence that these purse seine type vessels, if built according to approved plans of construction, do not, after engines and machinery are installed, need anything to increase the control of stability.

A number of witnesses testified that construction of such vessels according to approved plan and according to these plans here in evidence would produce a vessel of sufficient stability without any ballast at all in her hold, and that there should be avoided in a vessel as small as these the unnecessary taking up of space required for carrying cargo. That is the meaning the Court got from some of the statements and inferences properly to be drawn from statements of witnesses. It is possible that in the case of large vessels perhaps there would be more of an opportunity and a greater need for ballast in comparison with cargo space needs, but the evidence discloses that these smaller purse seine type fishing vessels have to conserve all the hold space properly available for the car-

riage of the fish cargo and their necessary stability is supplied by proper construction rather than by ballast.

I believe on that issue that there is ample evidence supporting the theory that the concrete is required or used, not primarily for stability, but to fair up or smooth the floor surface of the hold so as to accommodate the unloading of sardines or other fish cargo and to make it easier to keep the fish hold clean.

I don't see how one could reasonably conclude from the evidence before the Court that these plans of construction were improper or insufficient. It seems to me that the testimony is so overwhelmingly to the effect that the plans were sufficient that no one could reasonably conclude to the contrary, and the Court finds on that issue that the construction plans used by Mr. Petersen's boat building concern in the building of a series of boats of this type, including this second Nordic Pride and others, were proper and adequate construction plans for vessels of this type.

Likewise, I find from the preponderance of the evidence that Mr. Petersen and his boat building concern were competent boat builders, and that in the building of the second Nordic Pride, considering the use of bent oak frames instead of sawn fir frames, there was a faithful application of those construction plans to the construction of the vessel.

I further find from the evidence that this crew which manned this vessel on her fatal voyage was established by the evidence to have been a competent crew, and that so far as proper manning and equipment of the vessel were concerned, there was no unseaworthiness.

There was one point developed in the evidence which I do not recall hearing counsel on either side discuss during their argument, and that was whether or not the seaworthiness of the vessel (or the seamanship of the crew) was affected adversely by reason of the stowage and carriage of the extra web or seine upon the turntable with a dory laid on top of that, and whether or not that was permissible stowage for those articles on this voyage.

From the evidence as to what the necessity was for that stowage out there on deck, the reason seems to have been clearly developed that the crew intended to fish on the way down, specifically just off Cape Flattery, and I believe there is no serious contention but that it is universal practice to stow that equipment in that position on the vessel when it is to be engaged in fishing on the way, instead of only at the end of some long trip before the fishing grounds are reached; so that in so far as concerns the proper equipping of the vessel or the proper arranging of the equipment of the vessel in such a way as not to affect adversely her seaworthy condition, the customary practice was followed in this case, and the vessel was not rendered unseaworthy by virtue of the improper equipping, or improper stowing of the equipment, of the vessel during the voyage.

The preponderance of the evidence justifies the inference that the vessel foundered as the result of collision with drifting logs from broken up seagoing log rafts rather than as the result of the vessel's instability caused by structural defects, insufficient ballast or improper stowage of fishing gear.

■ Finally, it seems clear to the Court, upon all the evidence in this case and by the preponderance thereof, that there is ample proof of actual seaworthiness, both as to structural features of the vessel and as to the proper manning and equipping of the vessel for the voyage. I think that evidence clearly overcomes and is amply sufficient to overcome any presumption raised by law that she was unseaworthy because she was destroyed or lost without positive knowledge of the cause.

There is no proof in the case, no actual proof that is convincing to the Court, of unseaworthiness in fact, and there is no such proof of the death of any of these crew members as a result of the wrongful or negligent act of any of the petitioners in this case.

I think the proof amply establishes by a preponderance of the evidence that the petitioners and owners of the vessel exercised due diligence to make the vessel in all respects seaworthy and to properly man and equip the vessel, and that by reason of these considerations the petitioners should be exonerated and exempted from personal liability over and above the value of such remains of the vessel and her equipment as may be found, although the evidence discloses nothing so far saved from the vessel.